255 P.3d 784 (2011)
161 Wash.App. 727
STATE of Washington, Respondent,
v.
Bryan Edward ALLEN, Appellant.
No. 64466-1-I.
Court of Appeals of Washington, Division 1.
May 9, 2011.
*786 Lila Jane Silverstein, Marla Leslie Zink, Susan F. Wilk, Maureen Marie Cyr, Washington Appellate Project, Seattle, WA, for Appellant.
Ann Marie Summers, King County Prosecutor's Office, Seattle, WA, for Respondent.
APPELWICK, J.
¶ 1 Allen appeals his conviction for felony harassment, contending that he did not receive a fair trial because the trial court refused to give his proposed jury instruction on cross-racial eyewitness identification. Allen also argues that the prosecutor improperly vouched for the credibility of the complaining witness. Finally, Allen contends that his information and "to convict" instruction were deficient for not containing "true threat" as an element of felony harassment. Finding no error, we affirm.

FACTS
¶ 2 Gerald Kovacs was walking on University Way near NE 47th Street in the University District at dusk when two men approached him and asked him if he wanted to buy marijuana. He told them to fuck off. They began screaming and cursing and then followed him. He asked them why they were following him, and one of the men said, "I'm going to kill you, you B[itch]," and lifted his shirt to display what Kovacs thought was a handgun. Kovacs ran to the nearest gas station and called the police.
¶ 3 Kovacs described the person as wearing a black "hoodie" sweatshirt, a hat, and gold-rimmed sunglasses. He also reported that the person was similar to Kovacs in height and a bit heavier than Kovacs in weight. Police arrested Bryan Allen based on Kovacs's description. Kovacs was transported to the scene of Allen's detention and positively identified him as the man who had threatened him. The police searched Allen incident to his arrest. The police found no gun, marijuana, or cash on his person.
¶ 4 The State charged Allen with felony harassment. Allen did not exactly match Kovacs's physical description, in that he was four or five inches taller than Kovacs had estimated. At the time of trial Allen weighed 60 pounds more than Kovacs had estimated. The jury found Allen guilty as charged. Allen appeals.

DISCUSSION

I. Cross-Racial Eyewitness Identification Instruction
¶ 5 Allen first contends the trial court erred when it refused his proposed instructions regarding cross-racial eyewitness identification evidence. Allen and Kovacs are of different races.
¶ 6 Allen submitted two alternative proposed instructions. The first read:
"In this case, the identifying witness is of a different race than the defendant. In the experience of many, it is more difficult to identify members of a different race than member's [sic] of one's own [race]. Psychological studies support this impression. In addition, laboratory studies reveal that even people with no prejudice against other races and substantial contact with persons of other races still experience difficulty in accurately identifying members of a different race. Quite often people do not recognize this difficulty in themselves. You should consider these facts in evaluating the witness's testimony, but you must also consider whether there are other factors present in this case."
The second proposed instruction read:
"In this case, the defendant, Bryan [Allen], is of a different race than Gerald Kovacs, the witness who has identified him. You may consider, if you think it is appropriate to do so, whether the fact that the defendant is of a different race than the witness has affected the accuracy of the witness'[s] original perception or the accuracy of a later identification. You should consider that in ordinary human experience, some people may have greater difficulty in accurately identifying members of a different race than they do in identifying members of their own race. You may also consider whether there are other factors present in *787 this case which overcome any such difficulty of identification."[[1]]
The trial court refused both instructions.
¶ 7 In this case, there was no expert testimony on the reliability of cross-racial eyewitness identification evidence. The only testimony given on the subject was by the arresting officer, Anthony Bennett. On cross-examination, he agreed that he was "aware of studies suggesting that cross[-]racial identifications can be more difficult for people." He also agreed that "sometimes people of different races will have a more difficult time identifying somebody of a different race." He also testified that he did not see any indication of difficulties in Kovacs's identification. The defense followed up in closing argument regarding the reliability of such evidence.
¶ 8 Allen argues that he was denied his due process right to a fair trial and the right to a defense by the trial court's denial of his proposed instruction relating to cross-racial eyewitness testimony. Due process requires that jury instructions allow the parties to argue all theories of their respective cases supported by sufficient evidence, fully instruct the jury on the defense theory, inform the jury of the applicable law, and give the jury discretion to decide questions of fact. State v. Koch, 157 Wash.App. 20, 33, 237 P.3d 287 (2010), review denied, 170 Wash.2d 1022, 245 P.3d 773 (2011). Alleged errors of law in jury instructions are reviewed de novo. State v. Barnes, 153 Wash.2d 378, 382, 103 P.3d 1219 (2005).
¶ 9 Allen argues that modern research suggests that eyewitness testimony should be approached with great caution. Mistaken eyewitness identification is a leading cause of wrongful conviction. See State v. Riofta, 166 Wash.2d 358, 371, 209 P.3d 467 (2009) ("`The vast majority of [studied] exonerees (79%) were convicted based on eyewitness testimony; we now know that all of these eyewitnesses were incorrect.'" (alteration in original) (quoting Brandon L. Garrett, Judging Innocence, 108 Colum. L.Rev. 55, 60 (2008))); see also Eyewitness Identification Reform, INNOCENCE PROJECT, http://www.innocence project.org/Content/Eyewitness_ Identification_Reform.php (last visited Jan. 25, 2011). Eyewitness identification evidence is among the least reliable forms of evidence and yet is persuasive to juries. See Riofta, 166 Wash.2d at 377 & n. 5, 209 P.3d 467 (Chambers, J., concurring in dissent) (quoting Bernal v. People, 44 P.3d 184, 190 (Colo. 2002) (citing Gary L. Wells et al., Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads, 22 LAW & HUM. BEHAV. 603, 605 (1998) and other legal and psychological studies of the identification problem))). Recognition accuracy is poorer when the perpetrator is holding a weapon. Bernal, 44 P.3d at 190 (quoting Vaughn Tooley et al., Facial Recognition: Weapon Effect and Attentional Focus, 17 J. APPLIED SOC. PSYCHOL. 845, 854 (1987)).
¶ 10 Studies have shown that a cross-racial identification, or an identification when an eyewitness of one race is asked to identify a particular individual of another race, is an especially problematic identification. See State v. Cheatam, 150 Wash.2d 626, 646, 81 P.3d 830 (2003) (citing Thomas Dillickrath, Expert Testimony on Eyewitness Identification: Admissibility and Alternatives, 55 U. MIAMI L.REV. 1059, 1063-65 (2001)); State v. Cromedy, 158 N.J. 112, 120-21 727 A.2d 457 (1999); John P. Rutledge, They All Look Alike: The Inaccuracy of Cross-Racial Identifications, 28 AM. J.CRIM. L. 207, 211-12 (2001); Sheri Lynn Johnson, Cross-Racial Identification Errors in Criminal Cases, 69 CORNELL L.REV. 934, 942 (1984); Criminal Justice Section, Report to House of Delegates, AM. BAR ASS'N 4 (Aug. 2008), http:// www.abanet.org/crimjust/policy/eyewitness. pdf (hereinafter "Criminal Justice Section Report").
¶ 11 Recognition of difficulties associated with the identification of strangers is not new. State v. Romero, 191 N.J. 59, 73, 922 A.2d 693 (2007). Eighty-four years ago, Justice Frankfurter called "[t]he identification of *788 strangers . . . proverbially untrustworthy." FELIX FRANKFURTER, THE CASE OF SACCO AND VANZETTI: A CRITICAL ANALYSIS FOR LAWYERS AND LAYMEN 30 (1927). Justice Brennan observed in 1967 that "`[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor-perhaps it is responsible for more such errors than all other factors combined.'" United States v. Wade, 388 U.S. 218, 229, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (alteration in original) (quoting PATRICK M. WALL, EYE-WITNESS IDENTIFICATION IN CRIMINAL CASES 26 (1965)). "Indeed, academics have long questioned the reliability of eyewitness identifications." Romero, 191 N.J. at 73-74, 922 A.2d 693 (citing HUGO MUNSTERBERG, ON THE WITNESS STAND: ESSAYS ON PSYCHOLOGY AND CRIME 49-56 (1923) ("discussing early twentieth century experiments that revealed people's inability to recall details of witnessed crimes"); EDWIN BORCHARD, CONVICTING THE INNOCENT: ERRORS OF CRIMINAL JUSTICE xiii-xiv (1932) ("early case study of sixty-five exonerated defendants finding that `the major source' of wrongful conviction was witness misidentification")).
¶ 12 Some jurisdictions have permitted the use of some form of instruction addressing the validity of eyewitness identification evidence. See United States v. Telfaire, 469 F.2d 552, 558-59 (D.C.Cir.1972); State v. Long, 721 P.2d 483, 494-95 (Utah 1986); Cromedy, 158 N.J. at 131, 727 A.2d 457; Commonwealth v. Hyatt, 419 Mass. 815, 818-19, 647 N.E.2d 1168 (1995); United States v. Cannon, 26 M.J. 674, 675 (A.F.Ct.M.R.1988); People v. Palmer, 154 Cal.App.3d 79, 89, 203 Cal.Rptr. 474 (1984); State v. Hunt, 275 Kan. 811, 817-18, 69 P.3d 571 (2003); see also JUDICIAL COUNCIL OF CAL., CRIMINAL JURY INSTRUCTIONS 315 (2011) (permitting witnesses to consider whether the witness and defendant are of different races); NINTH CIRCUIT JURY INSTRUCTIONS COMM., MANUAL OF MODEL CRIMINAL JURY INSTRUCTIONS: FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT 4.11 (2010).[2] The American Bar Association's (ABA) House of Delegates adopted a recommendation on August 11-12, 2008 urging state jurisdictions to, among other actions, decrease the risk of erroneous convictions resulting from cross-racial identification, adopt model jury instructions that "inform juries of all of the factors that may enhance or detract from the reliability of an eyewitness identification, one of which may be the cross-racial nature of the identification." HOUSE OF DELEGATES, Recommendation, ABA 1 (Aug. 11-12, 2008) http://www.abanet. org/moratorium/policy/2000s/2008_AM_One HundredFourD.pdf.
¶ 13 Generally, the purpose of a jury instruction is to provide the jury with the law to be applied in the case. State v. Borrero, 97 Wash.App. 101, 107, 982 P.2d 1187 (1999), adhered to on remand, noted at 103 Wash. App. 1045, 2000 WL 1808190 (2000), aff'd, 147 Wash.2d 353, 58 P.3d 245 (2002). But, "the purpose of a cross-racial instruction is to alert the jury through a cautionary instruction that it should pay close attention to a possible influence of race." Cromedy, 158 N.J. at 133, 727 A.2d 457. "Jurors are more apt to comfortably discuss racial differences with such an instruction." Criminal Justice Section Report, at 2.
¶ 14 In contrast, many jurisdictions have declined to permit an instruction on eyewitness *789 identification.[3] Several states have specifically rejected a cross-racial identification instruction.[4] At least one state has cautioned against relying exclusively on an instruction. State v. Clopten, 2009 UT 84, 223 P.3d 1103, 1110-11, 1117 (holding that the trial court abused its discretion in refusing expert testimony on eyewitness identification) (citing Peter J. Cohen, How Shall They Be Known? Daubert v. Merrell Dow Pharmaceuticals and Eyewitness Identification, 16 PACE L.REV. 237, 272 (1996); Brian L. Cutler & Steven D. Penrod, Mistaken Identification: The Eyewitness, Psychology and the Law, 264 (1995); Edith Greene, Eyewitness Testimony and the Use of Cautionary Instructions, 8 U. BRIDGEPORT L.REV. 15, 20 (1987)). That court explained:
Subsequent research, however, has shown that a cautionary instruction does little to help a jury spot a mistaken identification. While this result seems counterintuitive, commentators and social scientists advance a number of convincing explanations. First, instructions "given at the end of what might be a long and fatiguing trial, and buried in an overall charge by the court" are unlikely to have much effect on the minds of a jury. Second, instructions may come too late to alter the jury's opinion of a witness whose testimony might have been heard days before. Third, even the best cautionary instructions tend to touch only generally on the empirical evidence. The judge may explain that certain factors are known to influence perception and memory, but will not explain how this occurs or to what extent. As a result, instructions have been shown to be less effective than expert testimony.
*790 Clopten, 223 P.3d at 1110-11 (footnotes and citation omitted) (quoting Cohen, supra, at 272).
¶ 15 Our Supreme Court addressed the appropriateness of a cross-racial eyewitness identification instruction in State v. Laureano, 101 Wash.2d 745, 768, 682 P.2d 889 (1984), overruled on other grounds by State v. Brown, 111 Wash.2d 124, 132-133, 761 P.2d 588 (1988), adhered to on recons., 113 Wash.2d 520, 529, 782 P.2d 1013, 787 P.2d 906 (1989). The Supreme Court, although it had "not yet ruled whether Telfaire[[5]] instructions are appropriate," concluded that the trial court did not err in refusing the cross-racial eyewitness instruction in that case. Id. at 768-69, 682 P.2d 889. It acknowledged several Washington Court of Appeals cases and cases from other state courts rejecting similar instructions. Id.
¶ 16 This court addressed the appropriateness of general instructions on eyewitness identification in State v. Watkins, 53 Wash. App. 264, 268, 766 P.2d 484 (1989). In that case, the trial court refused to give the requested instruction on eyewitness identification. Id. at 275, 766 P.2d 484. We affirmed, noting a line of cases from this division holding that a Telfaire-like instruction is impermissibly slanted and a comment on the evidence. Id. at 275, 766 P.2d 484; see also State v. Hall, 40 Wash.App. 162, 167, 697 P.2d 597 (1985) (holding that it was not an abuse of discretion for the trial court to refuse a Telfaire-like instruction because it was a comment on the evidence); State v. Delker, 35 Wash.App. 346, 348-49, 666 P.2d 896 (1983) (holding that the trial court did not err in refusing to give a Telfaire instruction and instead offering an alternative instruction advising jurors that they were the sole judges of the weight to be given to the testimony of each witness, etc.); State v. Ammlung, 31 Wash.App. 696, 701, 644 P.2d 717 (1982) (modified Telfaire instruction constituted a comment on the evidence); State v. Edwards, 23 Wash.App. 893, 897, 600 P.2d 566 (1979) (proposed instruction, "`You must be satisfied beyond a reasonable doubt of the accuracy of the identification of defendant as the person who committed the offense before you may convict him'" improperly called into question the credibility of particular witnesses); State v. Jordan, 17 Wash.App. 542, 544-46, 564 P.2d 340 (1977) (trial court did not err in denying a Telfaire instruction).
¶ 17 In Jordan, this court explained that an instruction that might be appropriate in a federal case, where there is no constitutional prohibition from the judge commenting on matters of fact, is not appropriate in Washington, where our constitution contains such a prohibition. 17 Wash.App. at 545, 564 P.2d 340; CONST. ART. 4, § 16. The court explained:
[P]atently, the focus and "emphasis" of the instruction is upon the credibility of identification witnesses. Credibility is a factual question. We believe that the instruction is impermissibly slanted to the degree that it should not be given in Washington. Witness credibility is more properly tested "by examination and cross-examination in the forum of the trial court." State v. Johnson, 12 Wash.App. 40, 45, 527 P.2d 1324 (1974). Closing argument affords counsel the appropriate means to point out any weaknesses in eyewitness identifications.
Id. at 545-46, 564 P.2d 340.
¶ 18 Allen argues this rationale has been challenged by subsequent research. Traditional trial protections of suppression hearings, voir dire, cross-examination of witnesses, closing arguments, and general jury instructions on the credibility of witnesses do not adequately address the special recognition impairments present in cross-racial eyewitness identification. Criminal Justice Section Report at 7. "Although cross-examination *791 is a powerful tool for exposing lies, it is not particularly effective when used against eyewitnesses who believe they are telling the truth." Jacqueline McMurtrie, The Role of the Social Sciences in Preventing Wrongful Convictions, 42 AM.CRIM. L. REV. 1271, 1277 (2005); see also Clopten, 223 P.3d at 1110. The additional protection of a cross-racial jury instruction is needed, "because the own-race effect strongly influences the accuracy of identification, because that influence is not understood by the average juror, because cross-examination cannot reveal its effects, and because jurors are unlikely to discuss racial factors freely without some authorization to do so." Sheri Lynn Johnson, Cross-Racial Identification Errors in Criminal Cases, 69 CORNELL L.REV. 934, 982 (1984).
¶ 19 At present, the existing alternative to permitting a jury instruction is to allow expert testimony on the issue. Under Washington law, expert testimony may be admitted, at the discretion of the trial court, to discuss the reliability of eyewitness testimony, but only if certain factors are present. Cheatam, 150 Wash.2d at 649, 81 P.3d 830.[6] But, even if admitted by the trial court, expert testimony is not always available, as it is expensive and there are a limited number of experts available. Criminal Justice Section Report, at 3. And, expert testimony may not explicitly permit juries to raise race-related issues in the jury room to the extent necessary to combat the undue reliance on eyewitness testimony.
¶ 20 Watkins and other cases held that an instruction relating to the reliability of eyewitness identification is a comment on the evidence in violation of the constitutional prohibition. Our state Constitution prohibits judicial comments on the evidence. CONST. art. IV, § 16. If Washington courts sought to adopt an instruction that would address the reliability of eyewitness testimony, it would need to be constitutionally appropriate. Any instruction that could lead the jury to infer that the trial court believed or disbelieved a witness constitutes a judicial comment on the evidence. State v. Faucett, 22 Wash.App. 869, 876, 593 P.2d 559 (1979). We survey Washington's jurisprudence seeking clarification on the question of whether any jury instruction could address the eyewitness identification issue without improperly commenting on the evidence. We especially consider those instructions that relate to the jury's evaluation of the evidence to compare those that have been held to violate the constitutional prohibition with those that have been approved by our courts.
¶ 21 Our courts have rejected several instructions relating to the jury's evaluation of the evidence as constituting comments on the evidence. See State v. Thompson, 132 Wash. 124, 128, 231 P. 461 (1924) (instruction cautioning juries on reliability of alibi evidence is comment on evidence); Faucett, 22 Wash. App. at 875, 877, 593 P.2d 559 (instruction that "`You will be slow to believe that any witness has testified falsely in the case, but if you do believe that any witness has wilfully testified falsely to any material matter, then you are at liberty to disregard the testimony of such witness entirely, except in so far as the same may be corroborated by other credible evidence in the case'" was an improper comment on the evidence because, "especially when a defendant declines to testify, as here[,] the court can be seen as indicating its own belief in the truthfulness of the unrebutted testimony of the State's witnesses."). Also, our courts have approved several instructions over constitutional objections that they commented on the evdience. See State v. Carothers, 84 Wash.2d 256, 525 P.2d 731 (1974) (accomplice liability instruction), overruled on other grounds by State v. Harris, 102 Wash.2d 148, 685 P.2d 584 (1984), overruled on other grounds by State v. Ray, 116 Wash.2d 531, 806 P.2d 1220 (1991); Murgatroyd v. Dudley, 184 Wash. 222, 231, 50 P.2d *792 1025 (1935) (expert witness testimony instruction); State v. Deatherage, 35 Wash. 326, 335, 77 P. 504 (1904) (evidence of flight instruction);[7]State v. Zimmerman, 130 Wash.App. 170, 181, 121 P.3d 1216 (2005) (instruction that alleged victim's testimony need not be corroborated in child molestation case); State v. Sampson, 40 Wash.App. 594, 600, 699 P.2d 1253 (1985) (unavailability of self-defense when defendant is aggressor instruction); see also 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.41, at 196 (3d ed. 2008) (WPIC) (instruction regarding an out of court statement by the defendant).[8]
¶ 22 Our Supreme Court's rationale in Carothers provides an especially useful contrast. 84 Wash.2d 256, 525 P.2d 731. In that case, the court considered an instruction similar to the current pattern instruction on accomplice evidence. Id. at 267, 525 P.2d 731; 11 WPIC 6.05,[9] at 184-85. The "standard instruction regarding accomplice testimony" told the jury that the testimony of an accomplice, given on behalf of the State, should be acted upon with great care and caution and should be subjected to careful examination in light of other evidence in the case. Carothers, 84 Wash.2d at 266, 525 P.2d 731. It further instructed that the jury should not convict upon such testimony alone unless, after carefully examining it, it was satisfied beyond all reasonable doubt of its truth. Id. at 266-67, 525 P.2d 731. The court held that the instruction did not constitute an impermissible comment:
An instruction to view the testimony of an accomplice with caution is an indication not of the judge's attitude toward the testimony of a particular witness, but of the attitude of the courts generally toward the testimony of witnesses of this type. It is an attitude which has been garnered from many years of observation of the prosecutorial process. The courts have an expertise upon this subject which the ordinary citizen cannot be expected to have. They have observed that innocent persons may be sent to prison or to death upon the testimony of an accomplice. At the same time such testimony is not invariably false and it may be the only proof available.
Balancing the right of society to punish the guilty against the duty to protect an innocent person falsely involved by another who has been offered leniency or immunity for his testimony, the courts have evolved the rule that the jury must be advised that the accomplice is a special kind of witness, required, as a matter of law, to be given a special kind of attention. . . .
. . . .
Far from being superfluous or objectionable, a cautionary instruction is mandatory if the prosecution relies upon the testimony of an accomplice. A conviction may rest solely upon the uncorroborated testimony of an accomplice only if the jury has been sufficiently cautioned by the court to subject the accomplice's testimony to careful examination and to regard it with great care and caution. State v. Johnson, 77 Wash.2d 423, 462 P.2d 933 (1969); State v. Denney, 69 Wash.2d 436, 418 P.2d 468 (1966); State v. Badda, 63 Wash.2d 176, 385 P.2d 859 (1963). We have observed that a cautionary instruction on accomplice testimony is not open to the objections which may be lodged against an instruction which singles out the testimony of a particular witness for discussion. The latter may well be argumentative, invading the province of the jury and suggesting the court's belief that the testimony of the *793 witness is suspect. State v. Huff, 76 Wash.2d 577, 458 P.2d 180 (1969).
While the cautionary instruction may, in the circumstances of the case, apply only to one witness and the jury will have no doubt about the witness to whom the instruction is referable, the court does not give the jury its evaluation of the particular witness before it. Rather, it instructs the jury about the provisions of a rule of law applicable to the class to which the witness belongs. It is a rule which has long found favor in the law, evolved for the protection of the defendant. There has been no showing before this court that it impedes the administration of justice. We adhere, therefore, to the rule that a cautionary instruction is proper where accomplice testimony is relied upon by the prosecution.
Id. at 267-70, 525 P.2d 731 (footnote omitted). The rationale applied in Carothers could apply in equal force to a cross-racial eyewitness identification instruction, which is not invariably false and at times is the only proof available to the State but has resulted in the convictions of innocent people. However, it is for the Supreme Court to consider whether there truly has been a showing that the cross-racial identification instruction "impedes the administration of justice." Id. at 269, 525 P.2d 731. At present, it has not provided approval of any pattern jury instruction on the subject.
¶ 23 Therefore, we follow the Supreme Court's lead in Laureano. We also follow our prior cases holding that an instruction about the reliability of eyewitness evidence risks violating the constitutional prohibition against comments on the evidence. See Edwards, 23 Wash.App. at 896-97, 600 P.2d 566; Watkins, 53 Wash.App. at 275, 766 P.2d 484. We conclude that Allen's due process rights were not violated. We hold that the trial court did not err by refusing to instruct the jury on cross-racial eyewitness identification.

II. Prosecutorial Misconduct
¶ 24 Allen argues that the prosecutor committed misconduct by inappropriately vouching for Kovacs's credibility in closing argument. The prosecutor stated in rebuttal closing argument:
So what's most important here is whether or not you accept Mr. Kovacs. I would point out to you from the evidence Mr. Kovacs is not a flake. He's not some derelict. The evidence would show he's a teacher, very passionate about his work. Not only is he a teacher[;] he is a special ed[ucation] teacher.
Allen objected. The court overruled the objection. The prosecutor continued:
The evidence will show that he teaches kids that have disabilities. The evidence will show that Kovacs has two master's degrees. This is a person that was walking on the street minding his own business and within a matter of minutes he's threatened with death.
¶ 25 It is improper for the prosecution to vouch for the credibility of a government witness. State v. Coleman, 155 Wash. App. 951, 957, 231 P.3d 212 (2010). review denied, 170 Wash.2d 1016, 245 P.3d 772 (2011). Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony. Id. But, a prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence. State v. Gregory, 158 Wash.2d 759, 860, 147 P.3d 1201 (2006). Prejudicial error will not be found unless it is "`clear and unmistakable'" that counsel is expressing a personal opinion. State v. Brett, 126 Wash.2d 136, 175, 892 P.2d 29 (1995) (quoting State v. Sargent, 40 Wash.App. 340, 344, 698 P.2d 598 (1985)). A prosecutor's remarks must be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury. State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997).
¶ 26 Allen contends that the prosecutor's comments constituted vouching because the prosecutor urged the jury to consider matters outside the record, especially that Kovacs was "not a flake . . . . not some derelict" and was a "special ed[ucation] teacher."
*794 ¶ 27 To prevail, the defendant who has preserved the issue by objection must show that the prosecutor's conduct was both improper and prejudicial. State v. McKenzie, 157 Wash.2d 44, 52, 134 P.3d 221 (2006). Comments are prejudicial if there was a "substantial likelihood" that the comments affected the jury. State v. Reed, 102 Wash.2d 140, 145, 684 P.2d 699 (1984). This court reviews trial court rulings on alleged prosecutorial misconduct for abuse of discretion. State v. Finch, 137 Wash.2d 792, 839, 975 P.2d 967 (1999).
¶ 28 Two cases inform the question here. In State v. Warren, the prosecutor argued that certain details about which the complaining witness testified were a "`badge of truth'" and had the "`ring of truth,'" and that specific parts of the witness's testimony "`rang out clearly with truth in it.'" 165 Wash.2d 17, 30, 195 P.3d 940 (2008), cert. denied, Warren v. Washington, ___ U.S. ____, 129 S.Ct. 2007, 173 L.Ed.2d 1102 (2009). Our Supreme Court held that this argument was proper because it was based on the evidence presented at trial rather than on personal opinion. Id.
¶ 29 In State v. Jackson, 150 Wash.App. 877, 884, 209 P.3d 553, review denied, 167 Wash.2d 1007, 220 P.3d 210 (2009), the prosecutor stated three times in closing argument that the police testified accurately. The court held that the prosecutor did not vouch for the officers' credibility because, looking at the argument in context, the prosecutor reminded the jury that it was the sole judge of credibility and then outlined which evidence could support the jury's conclusion that the officers were credible. Jackson, 150 Wash. App. at 884-85, 209 P.3d 553.
¶ 30 Here, the prosecutor's argument was properly based on the following evidence introduced at trial: Kovacs testified that he was a special education teacher in the Renton School District. He taught middle school children with behavioral disabilities such as autism. He had a master's degree in teaching from the University of Washington and a master's degree in special education from Pacific Lutheran University. He testified that he served for four years in the Army National Guard and had two adopted children. The prosecutor did not rely on information not presented to the jury. The prosecutor merely argued an inference from the evidence. In addition, the prosecutor reiterated that the jury was the sole evaluator of witness credibility. The prosecutor did not vouch for Kovacs and did not commit misconduct.
¶ 31 Allen contends that it was unfair for the prosecutor to allege that Kovacs was "`not some derelict'" after successfully arguing to exclude Kovacs's felony offense of attempted vehicular assault. Allen argues that the exclusion of this testimony allowed the prosecutor to "falsely paint Kovacs as a model citizen." But, a prosecutor is entitled to draw reasonable inferences from the evidence admitted at trial. Gregory, 158 Wash.2d at 860, 147 P.3d 1201. The fact that evidence not admitted contradicts that inference is not relevant to the question here. Allen has not challenged the evidentiary ruling relating to the exclusion of Kovacs's assault and may not do so via the backdoor.
¶ 32 We hold that the trial court did not abuse its discretion in permitting the contested comments by the prosecutor.

III. True Threat
¶ 33 Allen next claims that the information and to convict instruction for his felony harassment charge were deficient because they did not include an essential element of that crime. RCW 9A.46.020(1) defines harassment:
(1) A person is guilty of harassment if:
(a) Without lawful authority, the person knowingly threatens:
(i) To cause bodily injury immediately or in the future to the person threatened or to any other person; or
(ii) To cause physical damage to the property of a person other than the actor; or
(iii) To subject the person threatened or any other person to physical confinement or restraint; or
(iv) Maliciously to do any other act which is intended to substantially harm the person threatened or another with respect *795 to his or her physical or mental health or safety; and
(b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out. "Words or conduct" includes, in addition to any other form of communication or conduct, the sending of an electronic communication.
A person is guilty of felony harassment if the person harasses another person by threatening to kill the person threatened or any other person. RCW 9A.46.020(2)(b).
¶ 34 The First Amendment, applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law ... abridging the freedom of speech." Virginia v. Black, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). While the scope of the First Amendment is broad, it does not extend to "unprotected speech." State v. Kilburn, 151 Wash.2d 36, 42-43, 84 P.3d 1215 (2004). "True threats" occupy one category of unprotected speech. Id. at 43, 84 P.3d 1215. A true threat is "`a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of another person.'" Id. (alteration in original) (internal quotation marks omitted) (quoting State v. Williams, 144 Wash.2d 197, 208-09, 26 P.3d 890 (2001)). Consistent with this requirement, Washington courts interpret statutes criminalizing threatening language as proscribing only true threats, which are not protected by the First Amendment. State v. Tellez, 141 Wash.App. 479, 482, 170 P.3d 75 (2007).
¶ 35 Allen failed to raise his First Amendment argument until appeal. An appellate court may refuse to address a claim of error not raised in the trial court unless it finds a "manifest error affecting a constitutional right." RAP 2.5(a)(3). An error is "manifest" if it had practical and identifiable consequences in the case. State v. O'Hara, 167 Wash.2d 91, 99, 217 P.3d 756 (2009). To determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error. Id. at 100, 217 P.3d 756.
¶ 36 Allen contends that a true threat is an essential element of the crime of felony harassment and, as such, must be included in the charging information and defined in the to convict instruction. Here, the information stated:
That the defendant BRYAN EDWARD ALLEN in King County, Washington, on or about August 6, 2009, knowingly and without lawful authority, did threaten to cause bodily injury immediately or in the future to Gerald Kovacs, by threatening to kill Gerald Kovacs, and the words or conduct did place said person in reasonable fear that the threat would be carried out.
The to convict instruction required the jury to find the following elements to convict Allen of the crime of felony harassment:
(1) That on or about August 6, 2009, the defendant knowingly threatened to kill Gerald Kovacs immediately or in the future.
(2) That the words or conduct of the defendant placed Gerald Kovacs in reasonable fear that the threat to kill would be carried out;
(3) That the defendant acted without lawful authority; and
(4) That the threat was made or received in the State of Washington.
Also, the jury was instructed as to the definition of a "true threat":
Threat means to communicate, directly or indirectly, the intent to cause bodily injury in the future to the person threatened or to any other person;
To be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.[[10]]
*796 ¶ 37 Instructional errors based on legal rulings are reviewed de novo, as are constitutional questions. State v. Grande, 164 Wash.2d 135, 140, 187 P.3d 248 (2008); Brett, 126 Wash.2d at 171, 892 P.2d 29. The adequacy of a charging document is also reviewed de novo. State v. Williams, 162 Wash.2d 177, 182, 170 P.3d 30 (2007).
¶ 38 In State v. Atkins, 156 Wash.App. 799, 802, 236 P.3d 897 (2010), Atkins contended that the information and to convict instruction relating to his felony harassment charge were deficient because they did not include the essential element of a true threat. Id. at 802, 236 P.3d 897. This court held that true threat was not an essential element of the felony harassment charge. Id. This court also held that because the court's instructions included an explanation of true threat in a separate definition, the information and to convict instructions were not deficient. Id.
¶ 39 In Atkins, we found Tellez dispositive. Atkins, 156 Wash.App. at 806, 236 P.3d 897. In that case, we construed the felony telephone harassment statute, RCW 9.61.230(2)(b), and agreed with the State that "the constitutional concept of `true threat' merely defines and limits the scope of the essential threat element in the felony telephone harassment statute and is not itself an essential element of the crime." Tellez, 141 Wash.App. at 483-84, 170 P.3d 75. Consequently, the true threat requirement need not be included in the charging document or the to convict instruction. Id. A separate instruction defining true threat protects the defendant's First Amendment rights. Id.
¶ 40 After we published Atkins, our Supreme Court decided State v. Schaler, 169 Wash.2d 274, 236 P.3d 858 (2010). Glen Schaler was charged with two counts under the threats-to-kill provision of the harassment statute, RCW 9A.46.020(1)(a)(i), (1)(b), (2)(b)(ii). Schaler, 169 Wash.2d at 281, 236 P.3d. 858. At trial, Schaler requested a jury instruction requiring the jury to find that he subjectively intended to communicate a threat. Id. The trial court also instructed the jury on the definition of threat, explaining that "threat" means to communicate, directly or indirectly, the intent to cause bodily injury immediately or in the future to the person threatened or to any other person. Id. at 285, 236 P.3d 858. No party requested an instruction on the definition of true threat. Id. at 284, 236 P.3d 858.
¶ 41 On appeal, Schaler challenged the jury instructions for the first time, arguing that the First Amendment requires an explicit true threat instruction. Id. at 282, 236 P.3d 858. The Supreme Court held that the jury instructions were not sufficiently narrow to ensure that the jury would only convict Schaler if he had made a true threat. Id. at 287, 236 P.3d 858. The majority explained that, as the Supreme Court held in Kilburn, 151 Wash.2d at 43, 84 P.3d 1215, a statute proscribing true threats must be read to reach only those instances wherein a reasonable person would foresee that the statement would be interpreted as a serious expression of intention to take the life of another person. Schaler, 169 Wash.2d at 287, 236 P.3d 858. This required a mens rea of simple negligence as to the result of the threat. Id. The Supreme Court concluded, "Because the First Amendment requires negligence as to the result but the instructions here required no mens rea as to result, the jury could have convicted Schaler based on something less than a `true threat.'" Id. The Supreme Court therefore held that the jury instructions were erroneous for failing to include an instruction defining true threat. Id. But, the Supreme Court explained in a footnote:
Although the instructions in this case erroneously failed to limit the statute's scope to "true threats," the problem is unlikely to arise in future cases. After our opinion in [State v. Johnston, 156 Wash.2d 355, 127 P.3d 707 (2006),] limited the bomb threat statute's scope to "true threats," the Washington Pattern Jury Instructions Committee amended the pattern instruction defining "threat" so that it matches the definition of "true threat." [11 WPIC 2.24] ("To be a threat, a statement or act must occur in a context . . . where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat. . . ."). Cases employing the new instruction defining "threat" will therefore *797 incorporate the constitutional mens rea as to the result.
Id. at 288 n. 5, 236 P.3d 858.
¶ 42 Schaler expressly left open the question of whether the required mens rea is an essential element of the felony harassment charge such that it needed to be included in the information and to convict instructions. The court, when considering whether the failure to instruct the jury on true threat constituted harmless error, wrote:
We must further determine whether the omission of the constitutionally required mens rea from the jury instructions is subject to harmless error analysis. The situation is analogous to one in which the jury instructions omit an element of the crime.6 An omission of an essential element from the jury instructions may be harmless when it is clear that the omission did not contribute to the verdict. State v. Brown, 147 Wash.2d 330, 340-41, 58 P.3d 889 (2002).
6 The situation is not identical to omitted-element cases. Whether the constitutionally required mens rea is an "element" of a felony harassment charge is a question that we need not decide. (We note that there is a Court of Appeals opinion on point, State v. Tellez, 141 Wash.App. 479, 170 P.3d 75 (2007), but we express no opinion on the matter.) It suffices to say that, to convict, the State must prove that a reasonable person in the defendant's position would foresee that a listener would interpret the threat as serious. So, it is useful to consider other cases in which something that the State had to prove to convict was omitted from the jury instructions.
Schaler, 169 Wash.2d at 288, 236 P.3d 858 (formatting omitted).
¶ 43 Allen argues that the reasoning in Schaler supports his argument. He claims that the mens rea of a crime is always an essential element that needs to be included in the to convict instruction and the charging document. The State argues that because Schaler expressly approved WPIC 2.24 as properly instructing the jury as to the mens rea of a threat-to-kill harassment charge, and WPIC 2.24 was given in this case, the jury instructions satisfy Schaler. Essential elements must be included in a to convict instruction and in the charging document. See, e.g., State v. Smith, 131 Wash.2d 258, 265, 930 P.2d 917 (1997) (holding that a to convict instruction must include all essential elements of a crime); State v. Hopper, 118 Wash.2d 151, 155, 822 P.2d 775 (1992) (due process requires a charging document to include all essential elements of a crime, statutory and nonstatutory). Our Supreme Court stated in State v. Osborne that a charging document must apprise the defendant of the nature of the offense: at a minimum, "`the defendant would need to be aware of the acts and the requisite state of mind in which they must be performed to constitute a crime.'" 102 Wash.2d 87, 93, 684 P.2d 683 (1984) (quoting State v. Holsworth, 93 Wash.2d 148, 153 n. 3, 607 P.2d 845 (1980)).
¶ 44 We acknowledge that the Supreme Court characterized the definition of true threat as a "constitutionally required mens rea" in Schaler. 169 Wash.2d at 288, 236 P.3d 858. Schaler noted that a mens rea as to result is required in a true threats case:
In the context of criminalizing speech, however, the lack of mens rea as to the result is critical. Because the First Amendment limits the statute to proscribing "true threats," it must be read to reach only those instances "`wherein a reasonable person would foresee that the statement would be interpreted as a serious expression of intention . . . to take the life of another person.'" Kilburn, 151 Wash.2d at 43, 84 P.3d 1215 (emphasis added) (internal punctuation and quotation marks omitted) (quoting Williams, 144 Wash.2d at 208-09, 26 P.3d 890). This standard requires the defendant to have some mens rea as to the result of the hearer's fear: simple negligence. See W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 31, at 169 (5th ed. 1984) (describing negligence as the failure to guard against "a risk of [certain] consequences, sufficiently great to lead a reasonable person. . . to anticipate them"). Because the First Amendment requires negligence as to the result but the instructions here required no mens rea as to result, the jury could have convicted Schaler based on something less than a "true threat." The instructions were therefore in error.
*798 Id. at 287, 236 P.3d 858 (alteration in original) (footnote omitted). The information and the to convict instruction both stated a mens rea, "knowingly". The question here is whether an additional mens rea as to result, that of negligence, must be separately stated.
¶ 45 The Supreme Court's analysis in Schaler hinged in part on the definition of "knowingly" given in the instructions in that case: "`A person threatens "knowingly" when the person subjectively intends to communicate a threat.'" Schaler, 169 Wash.2d at 285, 236 P.3d 858. Justice Stephens stated in the lead opinion, "If `knowingly threaten' had been left to its ordinary meaning, it could be understood to require that the speaker be aware that his words or actions frightened the hearerafter all, how can one knowingly threaten without knowing that what one says is threatening to another?" Schaler, 169 Wash.2d at 286, 236 P.3d 858. Left to its ordinary meaning, "knowingly threaten" satisfies the "know or foresee" mens rea element as to the result.
¶ 46 The information and the to convict instruction here each contained the statutory mens rea "knowingly." The jury instruction given in this case, defining "knowingly," did not contain the defect found in Schaler. This definition, combined with the definition of true threat, correctly conveys the necessary definitions consistent with Schaler.
¶ 47 The Supreme Court emphatically stated in Schaler that its opinion did not address the issues raised in Tellez. Schaler, 169 Wash.2d at 288 n. 6, 236 P.3d 858. Accordingly, we hold that this court's previous cases addressing this issue are dispositive and hold that true threat is merely the definition of the element of threat which may be contained in a separate definitional instruction. See, e.g., Atkins, 156 Wash.App. at 802, 236 P.3d 897; Tellez, 141 Wash.App. at 483-84, 170 P.3d 75. In fact, "[n]o Washington court has ever held that a true threat is an essential element of any threatening-language crime or reversed a conviction for failure to include language defining what constitutes a true threat in a charging document or `to convict' instruction." Tellez, 141 Wash.App. at 483, 170 P.3d 75. This court has consistently repeated that "[s]o long as the court defines a `true threat' for the jury, the defendant's First Amendment rights will be protected." Id. at 484, 170 P.3d 75.
¶ 48 Allen also urges this court to revisit the analysis in Tellez on the contention that the Supreme Court "signaled its view" that a true threat is an element of harassment crimes in Johnston, 156 Wash.2d 355, 127 P.3d 707. To the contrary, in Johnston, the court held that the "jury instructions given at trial were insufficient" because the "jury must be instructed that a conviction . . . requires a true threat and must be instructed on the meaning of a true threat." Id. at 366, 127 P.3d 707. Johnston is not contrary to Tellez and Atkins.
¶ 49 Here, the to convict instruction required the jury to find the elements to convict Allen of the crime of felony harassment, including a knowing threat to kill. Also, the jury was instructed as to the definition of a true threat. As in Atkins and Tellez, this definitional instruction was sufficient to protect Allen's First Amendment rights. It ensured that the jury would convict Allen only if it deemed his threat toward Kovacs a true threat. Allen has failed to raise a manifest constitutional error warranting review by this court.
¶ 50 We affirm.
WE CONCUR: ELLINGTON and COX, JJ.
ELLINGTON, J. (concurring).
¶ 51 Under State v. Laureano,[1] we are constrained to affirm. I write separately because we should advise jurors of a fact known to us but contrary to their intuition: that cross-racial identification should be carefully scrutinized. We can draft such an instruction without making a judicial comment on evidence, and I believe it is past time to do so.
¶ 52 As the majority points out, modern research establishes that cross-racial identification of strangers is much less reliable than *799 same-race identifications. Most jurors, however, have no such understanding. Yet this little known fact matters greatly to a juror's assessment of such testimony.
¶ 53 Previous Washington cases suggest instead the use of expert witnesses to educate the jury. But such experts are few and expensive, and it is unrealistic to suppose an expert will be available and affordable in every case where cross-racial identification is a key part of the State's evidence.
¶ 54 Basic fairness requires that jurors be informed about established frailties in certain kinds of evidence when such frailties are not common knowledge. Accordingly, we instruct on the reliability of accomplice testimony. This does not constitute a comment by the trial judge on the evidence at trial, but rather is a cautionary statement of the attitude of the courts generally toward the testimony of witnesses of this type . . . which has been garnered from many years of observation of the prosecutorial process.[2]
¶ 55 The experience of courts has similarly revealed the frailties of cross-racial identification, and a simple cautionary instruction can be crafted that does not comment on the evidence. For example, the language below serves to advise the jury of the pitfalls inherent in such evidence without commenting upon it:
Testimony of a witness identifying a person of another race who is a stranger to the witness should be considered with care, because research shows that some people have greater difficulty accurately identifying members of a different race.
¶ 56 We are not immune from wrongful convictions based upon mistaken eyewitness identifications. An instruction informing jurors of the known research should be approved for use by Washington trial courts.
I CONCUR: COX, J.
NOTES
[1] This instruction mirrors the instruction proposed by the American Bar Association's Criminal Justice Section. See Criminal Justice Section, Report to House of Delegates, AM. BAR ASS'N 4 (Aug. 2008), http://www.abanet.org/crimjust/ policy/eyewitness.pdf (discussing model jury instructions on cross-racial identification).
[2] The Ninth Circuit has adopted a model instruction regarding eyewitness identification in general:

You have heard testimony of eyewitness identification. In deciding how much weight to give to this testimony, you may consider the various factors mentioned in these instructions concerning credibility of witnesses.
In addition to those factors, in evaluating eyewitness identification testimony, you may also consider:
(1) the capacity and opportunity of the eyewitness to observe the offender based upon the length of time for observation and the conditions at the time of observation, including lighting and distance;
(2) whether the identification was the product of the eyewitness's own recollection or was the result of subsequent influence or suggestiveness;
(3) any inconsistent identifications made by the eyewitness;
(4) the witness's familiarity with the subject identified;
(5) the strength of earlier and later identifications;
(6) lapses of time between the event and the identification[s]; and
(7) the totality of circumstances surrounding the eyewitness's identification.
NINTH CIRCUIT JURY INSTRUCTIONS COMM., supra, 4.11 (alteration in original).
[3] See Brodes v. State, 279 Ga. 435, 439 n. 6, 614 S.E.2d 766 (2005) (citing Buchanan v. State, 561 P.2d 1197, 1207 (Alaska 1977) (not necessary where jury adequately instructed on burden of proof); State v. Valencia, 118 Ariz. 136, 137-38, 575 P.2d 335 (Ct.App.1977) (a constitutionally-prohibited comment on the evidence; general instructions sufficient); Conley v. State, 270 Ark. 886, 607 S.W.2d 328 (1980) (impermissible comment on the evidence); People v. Palumbo, 192 Colo. 7, 11, 555 P.2d 521 (1976) (not necessary where jury adequately instructed on witness credibility); State v. Freeman, 380 So.2d 1288 (Fla.1980) (not necessary where jury adequately charged on the State's burden of proof); State v. Vinge, 81 Hawai'i 309, 916 P.2d 1210, 1217 (1996); (instruction superfluous in light of adequate jury instructions); Brown v. State, 468 N.E.2d 841, 843 (Ind.1984) (Indiana law "distinctly biased against jury instructions which single out eyewitness testimony" for emphasis; general instructions on weighing testimony sufficient); Jones v. Commonwealth, 556 S.W.2d 918, 921 (Ky.Ct.App.1977) (jury instruction on reasonable doubt covered the topic); State v. Artis, 391 So.2d 847, 848 (La. 1980) (instruction unnecessary in light of adequate instructions on general credibility of witnesses); Nevius v. State, 101 Nev. 238, 248-49, 699 P.2d 1053, 1060 (1985) (eyewitness instructions are duplicitous of general instructions on witness credibility and proof beyond a reasonable doubt); State v. Paige, 316 N.C. 630, 663, 343 S.E.2d 848 (1986) (general charge of burden of proof sufficient); State v. Ferguson, 391 N.W.2d 172 (N.D.1986) (instructions on burden of proof and witness credibility were sufficient); State v. Classen, 31 Or. App. 683, 693, 571 P.2d 527 (1977), rev'd on other grounds, 285 Or. 221, 590 P.2d 1198 (1979) (suggested instruction overemphasized the issue and was a comment on the evidence); State v. Payette, 557 A.2d 72 (R.I. 1989) (charge on burden of proof of identification sufficient); State v. Robinson, 274 S.C. 198, 262 S.E.2d 729 (1980) (state constitution forbids a jury charge on facts; charge on burden of proof re identification sufficient); Roy v. State, 627 S.W.2d 488, 490 (Tex.App.1981) (charge unnecessary where adequate instructions on burden of proof given); Pearson v. State, 811 P.2d 704, 710 (Wyo.1991) (general instructions on reasonable doubt and witness credibility sufficient)). But see State v. Tatum, 219 Conn. 721, 735-36, 595 A.2d 322 (1991) (Connecticut permits a charge on eyewitness identification, noting that trial courts may comment on evidence in Connecticut).
[4] See State v. Wiggins, 74 Conn.App. 703, 707-08, 813 A.2d 1056 (2003) (jury was properly charged with a general instruction on eyewitness identification and defendant was not entitled to an additional instruction on cross-racial identification issues); Lenoir v. State, 77 Ark.App. 250, 260, 72 S.W.3d 899 (2002) (due process not violated by court's refusal to give cross-racial instruction); Miller v. State, 759 N.E.2d 680, 684 (Ind.Ct.App. 2001) (instruction proper only when defendant shows specific risk identification mistaken due to cross-racial factors); State v. Hadrick, 523 A.2d 441, 444 (R.I.1987) (proposed cross-racial identification instruction is an improper comment on the evidence); People v. Bias, 131 Ill.App.3d 98, 104, 475 N.E.2d 253, 86 Ill.Dec. 256 (1985) ("In view of the conflicting empirical evidence, we feel that determination of the propriety of an instruction such as that at issue is better left to committees of the bench and bar as opposed to courts of review.").
[5] In Telfaire, the court noted that to safeguard the presumption of innocence it had previously pointed out the importance of and need for a special instruction on the key issue of identification. 469 F.2d at 555-56. The court proposed a model special identification instruction for use in future cases, specifically instructing the jury to evaluate the value of eyewitness testimony based on several considerations. Id. at 558-59. The majority's proposed model instruction did not speak specifically to cross-racial eyewitness identification. Chief Judge Bazelon urged in his concurring opinion that juries be charged specifically on the pitfalls of cross-racial identification and also proposed sample instruction language. Id. at 559-61 (Bazelon, C.J., concurring).
[6] In Cheatam, our Supreme Court held that that where eyewitness identification of the defendant is a key element of the State's case, the trial court must carefully consider whether expert testimony on the reliability of eyewitness identification would assist the jury in assessing the reliability of eyewitness testimony. 150 Wash.2d at 649, 81 P.3d 830. "In making this determination the court should consider the proposed testimony and the specific subjects involved in the identification to which the testimony relates, such as whether the victim and the defendant are of the same race, whether the defendant displayed a weapon, the effect of stress, etc." Id.
[7] The Washington Supreme Court Committee on Jury Instructions does not recommend instructions on flight, because it singles out and emphasizes particular evidence. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.21, at 189 (3d ed. 2008) (WPIC) (evidence of flight).
[8] No published cases address whether this instruction is a comment on the evidence.
[9] WPIC 6.05 states:

Testimony of an accomplice, given on behalf of the [State][City][County], should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.
(Alterations in original.)
[10] This instruction is based on 11 WPIC 2.24, at 72-73.
[1] 101 Wash.2d 745, 682 P.2d 889 (1984).
[2] State v. Carothers, 84 Wash.2d 256, 267, 525 P.2d 731 (1974).