# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 41902-5-11 |
| Respondent, | BY_____ DEPUTY |
| v. | PART-PUBLISHED OPINION |
| MARTIN A. JONES, | |
| Appellant. | |

WIGGINS, J.P.T.[1] — Martin A. Jones appeals his jury conviction for attempted first degree murder. Jones argues that his constitutional right to a public trial and his right to be present were violated when, during a court recess off the record, the trial court clerk drew four juror names to determine which jurors would serve as alternates. In light of our Supreme Court's recent public trial cases that make virtually any courtroom closure structural error, we agree with Jones that the trial court violated his public trial rights. Accordingly, we vacate his conviction and remand for a new trial.

In the unpublished portion of this opinion, we address Jones's other contentions. First, he challenges his conviction on the basis of improperly suggestive and unreliable photo identification procedures. Second, he argues that the trial court, in disallowing certain testimony and evidence, violated his constitutional right to present a defense. Finally, in a pro se statement of additional grounds (SAG),[2] Jones challenges his conviction for several other reasons. Unlike the public trial issue, we hold that none of these arguments presents reversible error.

---

[1] Justice Charlie Wiggins is serving as a judge pro tempore of the Court of Appeals, Division II, pursuant to CAR 21(c).

[2] RAP 10.10.

## FACTS

### I. FACTUAL BACKGROUND

Early in the morning on February 13, 2010 in Long Beach, Washington State Patrol Trooper Jesse Greene pulled over a minivan driven by Susan Jones,[3] Martin Jones's wife, for driving in excess of the speed limit. Trooper Greene believed Susan Jones was intoxicated and began conducting field sobriety tests. During this time, Trooper Scott Johnson arrived as backup. Trooper Greene arrested Susan Jones for driving under the influence.

Trooper Johnson asked Susan Jones if there was someone available who would pick up the minivan, to which she replied "Marty" and provided a phone number. Trooper Johnson wrote "Marty" and the phone number on his hand. Trooper Greene then took Susan Jones to the Long Beach Police Department for processing. Shortly after being placed into custody, Susan Jones sent text messages to Jones informing him of her arrest.

Before leaving the scene, Trooper Greene requested a towing company to tow the minivan. Trooper Johnson began processing the minivan's contents until George Hill, owner of Hill Auto Body & Towing, arrived in short order.

As the minivan was being prepared for towing, Trooper Johnson noticed a white male approaching. This white male was visibly agitated and spoke to Hill, asking him what he was doing. Hill indicated that he was preparing the vehicle for towing. As the unidentified white male began walking away, Trooper Johnson contacted him and asked if he needed help with anything. The white male responded that he did not need help and continued walking away.

Trooper Johnson went back to processing the minivan's contents. Sometime later, Hill saw a white male approach Trooper Johnson from behind and grab him. Hill heard a gunshot

---

[3] For clarity, we will refer to Susan Jones by her first and last name and will refer to Martin Jones, the appellant, simply as Jones.

and smelled gunpowder. The white male had shot Trooper Johnson in the back of the head. Trooper Johnson, still conscious, made eye contact with the man who shot him and returned fire. Hill also gave chase, but the man fired upon him; then, Hill returned to assist Trooper Johnson. Trooper Johnson watched the shooter flee.

Hill contacted the Washington State Patrol dispatcher, who notified law enforcement personnel. Long Beach police arrived and one of the officers took Trooper Johnson to Ocean Beach Hospital in Ilwaco. The physician who initiated treatment arranged for Trooper Johnson's transfer to Oregon Health Sciences University Hospital (OHSU) to ensure that Trooper Johnson had access to a trauma surgeon.

At the scene, investigating officers found one .22 caliber short cartridge casing where Trooper Johnson had been shot. The cartridge was stamped with the logo for Cascade Cartridge, Inc., an ammunition manufacturer.

Officers at the scene employed two K-9 units to track the scent from the shooting scene. One of these units led to the block on which Martin and Susan Jones resided. Police realized that the dog was approaching Susan Jones's home.

Police surrounded the Joneses' home. Jones exited the home and walked toward the beach. Police followed him and detained him at gunpoint. Jones told police that he was going for a morning walk on the beach and that he had been asleep all night. Police questioned Jones but released him during further investigation.

Meanwhile, Trooper Johnson recuperated at OHSU for about three days following the shooting. During this time he was shown several photographs of potential suspects in photomontages, as well as individual photographs. Trooper Johnson did not identify the shooter in any of these photos. Trooper Johnson began asking to see a photo of Susan Jones's husband, which officers eventually showed him. Trooper Johnson identified Jones as the shooter.

3

Following Trooper Johnson's identification, officers arrested Jones, who continued to claim he was at home asleep at the time of the shooting. Police obtained warrants to search his home and phone records. The phone records disclosed several phone calls exchanged between Jones and his neighbor in the early morning hours of February 13, 2010. A search of Jones's home disclosed a box of .22 caliber Cascade Cartridge, Inc. ammunition manufactured in 1999, which matched the .22 shell casing found at the scene of Trooper Johnson's shooting.

II. PRETRIAL PROCEEDINGS

The State charged Jones with attempted first degree murder. Jones was initially arraigned in Pacific County, but due to pretrial publicity, Jones requested a venue change. The court granted Jones's motion and transferred the case to Thurston County Superior Court. Jones filed an affidavit of prejudice against Thurston County Superior Court Judge Pomeroy. Unable to accommodate the trial in Thurston County following the affidavit, the case was transferred back to Pacific County. Pacific County Superior Court then transferred venue to Pierce County.

The parties exchanged several pretrial evidentiary motions. Jones planned to present evidence that Trooper Greene had observed a different white male walking past the minivan 40 minutes before the shooting, just after stopping Susan Jones. The State successfully moved to exclude this evidence as impermissible "other suspect" evidence.

Jones also moved to suppress Trooper Johnson's eyewitness identification or alternatively present expert testimony regarding the questionable reliability of eyewitness identifications. The court denied Jones's motion to suppress but allowed his expert to testify.

III. TRIAL

During trial, Jones sought to impeach the testimony of Sara Trejo, the Washington State Patrol Crime Lab's fingerprint analyst, with the e-mail of Chris Sewell, who had called the State's investigation "haphazard" and otherwise had criticized communication breakdowns

4

among law enforcement agencies. The trial court denied the use of the e-mail for impeachment, concluding that the email was a collateral matter. Jones later sought to present the testimony of Chris Sewell in his case-in-chief, but the court excluded this testimony as unduly prejudicial under ER 403.

At the conclusion of the evidence, the court indicated that the court clerk would randomly draw the names of four jurors from a rotating cylinder to determine which jurors would be alternates. During the defense's closing arguments, there was a court recess during which the court clerk randomly pulled four jurors' names. The court announced the names of the four alternate jurors following closing arguments and excused these jurors. Jones did not object to any aspect of the alternate juror drawing.

The jury found Jones guilty of attempted first degree murder and returned a verdict that included a firearm sentencing enhancement. Following the verdict, Jones moved for a new trial, claiming that the random drawing of alternate jurors violated his right to a public trial and right to be present and appear and defend. He also asserted that he should have been able to present evidence that another suspect shot Trooper Johnson. The trial court denied Jones's motions. Jones appealed.

## ANALYSIS

I. JONES'S RIGHT TO A PUBLIC TRIAL WAS VIOLATED BECAUSE THE DRAWING FOR ALTERNATE JURORS WAS NOT DONE IN OPEN COURT, ENTITLING JONES TO A NEW TRIAL

The Sixth Amendment to the United States Constitution and by article I, section 22 of the Washington Constitution guarantee the right to a public trial. The state constitution also requires that "[j]ustice in all cases shall be administered openly." CONST. art. I, § 10. A defendant does not waive his public trial right by failing to object to a closure during trial. *State v. Wise*, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012). "'Whether a criminal accused's constitutional public trial

right has been violated is a question of law, subject to de novo review on direct appeal.'" *Wise*, 176 Wn.2d at 9 (quoting *State v. Easterling*, 157 Wn.2d 167, 173-74, 137 P.3d 825 (2006)).

Under our Supreme Court's recent guidance on the public trial right, we first determine whether a closure that triggers the public trial right occurred by asking if, under considerations of experience and logic, "the core values of the public trial right are implicated." *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012) (lead opinion).[4] If there is a closure, we look to whether the trial court properly conducted a *Bone-Club*[5] analysis before closing the courtroom. *State v. Paumier*, 176 Wn.2d 29, 35, 288 P.3d 1126 (2012); *Wise*, 176 Wn.2d at 12. If the trial court failed to do so, then a "per se prejudicial" public trial violation has occurred "even where the defendant failed to object at trial." *Wise*, 176 Wn.2d at 18. The remedy is typically a new trial. *Wise*, 176 Wn.2d at 19.

Applying these standards to this case, we conclude that the trial court violated Jones's public trial right, so he is entitled to a new trial. The drawing of alternate jurors occurred off the record during a court recess. The trial court failed to engage in a *Bone-Club* analysis, resulting in an error that is per se prejudicial. We must therefore vacate Jones's conviction and remand this case for retrial.

A. The Experience and Logic Test Indicates that the Alternate Juror Drawing Constituted a Closure

The United States Supreme Court originally developed the experience and logic test to determine whether the public's right to access trials attaches under the First Amendment. *See*

---

[4] Although *Sublett* was a splintered decision, at least five justices voted to adopt the experience and logic test. *See* 176 Wn.2d at 73 (lead opinion), 136 (Stephens, J., concurring) ("I . . . believe considerations of logic and experience appropriately guide the determination of when the public trial right attaches.").

[5] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

*Press-Enterprise Co. v. Superior Court,* 478 U.S. 1, 7, 106 S. Ct. 2735, 92 L. Ed. 2d (1986) (*Press* II). The experience prong of the test "asks 'whether the place and process have historically been open to the press and general public.'" *Sublett,* 176 Wn.2d at 73 (*quoting Press* II, 478 U.S. at 8). In other words, the court engages in an historical inquiry to determine whether the type of procedure is one that has traditionally been open to the public. "The logic prong asks 'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Sublett,* 176 Wn.2d at 73. Relevant to logic inquiry are the overarching policy objectives of having an open trial such as fairness to the accused ensured by permitting public scrutiny of proceedings. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 572, 100 S. Ct. 2914, 65 L. Ed. 2d 973 (1980) ("People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing."); *State v. Brightman,* 155 Wn.2d 506, 514, 122 P.3d 150 (2005) ("The public trial right serves to ensure a fair trial, to remind the officers of the court of the importance of their functions, to encourage witnesses to come forward, and to discourage perjury."). If both prongs of the experience and logic test are implicated, the public trial right attaches, and the "*Bone-Club* factors must be considered before the proceeding may be closed to the public." *Sublett,* 176 Wn.2d at 73. We proceed to provide a more detailed experience and logic analysis.

1. The Washington "experience" of selecting alternate jurors is varied but is typically part of voir dire, which is performed in open court

Although selecting alternate jurors has not received a great deal of attention in Washington, our courts' historical and current practices indicate that alternate juror selection is largely performed at the same time and in the same way as voir dire, and thus occurs on the record in a courtroom that is open to the public. Therefore, the experience of alternate jury selection in this state has been one that traditionally the public has been able to witness.

At common law, if a juror became incapacitated, the entire jury was discharged, a new jury was selected, and the case retried. *See Recent Cases*, 11 WASH. L. REV. 106, 110 (1936) (citing *Dennis v. State*, 96 Miss. 96, 50 So. 499 (1909); *State v. Hasledahl*, 2 N.D. 521, 52 N.W. 315 (1892)). Washington's variant of the common law rule allowed the trial to continue without an incapacitated juror if both parties agreed or to retry the case before a new jury if the parties did not agree. 2 HILL'S CODE OF PROC., ch. II, § 360. Washington had no rules directly on point for juror incapacitation in criminal cases and applied civil jury rules in all cases until 1917. *See* REM. 1915 CODE § 2137 (juror rules in criminal trials governed by civil rules); PIERCE'S CODE § 8511 (1919) (civil rules for juror incapacitation unchanged since 1891).

In 1917, the Legislature passed Senate Bill 136, titled "Alternate Jurors in Criminal Actions." LAWS OF 1917, ch. 37, § 1. It provided in pertinent part,

> Whenever, in the opinion of a judge of a superior court about to try a [felony] defendant . . . [and] the trial is likely to be a protracted one, the court may cause an entry to that effect to be made in the minutes of the court, and thereupon, immediately after the jury is impaneled and sworn the court may direct the calling of one or two additional jurors, in its discretion, to be known as "alternate jurors." Such jurors must be drawn from the same source, and in the same manner, and of the same qualifications as the jurors already sworn, to be subject to the same examination and challenge . . . . If, before the final submission of the case, a juror die, or become ill, so as to be unable to perform his duty, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box and be subject to the same rules and regulations as though he had been elected as one of the original jurors.

LAWS OF 1917, ch. 37, § 1. Thus, Washington's first enactment regarding alternate jurors not only specified a particular procedure for the alternate juror selection, but it specifically instructed that alternate jurors be called in the same manner as deliberating jurors and subject to for-cause and peremptory challenges in open court. This statute remained in effect until 1984. *See* former RCW 10.49.070 (1950), *repealed by* LAWS OF 1984, ch. 76, § 30(6).

Criminal Rule (CrR) 6.5 superseded former RCW 10.49.070. It directs that "[w]hen the jury is selected the court may direct the selection of one or more additional jurors, in its discretion, to be known as alternate jurors." CrR 6.5 also states that when "a juror is found unable to perform the duties the court shall order the juror discharged, and the clerk shall draw the name of an alternate who shall take the juror's place on the jury." CrR 6.5, like former RCW 10.49.070, contemplates that all jurors—whether deliberating jurors or alternate jurors—are selected at the same time through the same process.

Washington's pattern jury instructions also indicate that alternate juror selection occurs before trial during voir dire. 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL APP. C THE CRIMINAL JURY TRIAL, at 787-88 (3d ed. 2008 & Supp. 2011) ("If alternate jurors are to be empaneled [sic], they should be called, questioned on voir dire, and instructed on their duties as alternates at this time.").

Another provision instructs the judge to address the alternate jurors by stating, "At the outset of this trial, you were selected to serve in case one of the jurors became unable to serve on the jury." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.69, at 137 (3d ed. 2008 & Supp. 2011). The pattern jury instructions thus indicate that the trial courts should handle matters pertaining to alternate jurors in the same manner as their deliberating counterparts.

Under Washington's civil rules, "[a]lternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath, and shall have the same functions, powers, facilities, and privileges as the regular jurors." CR 47(b). Where one to two alternates will be impaneled, each party receives one additional peremptory challenge. CR 47(b). In the case of three or four alternates, each party may exercise two additional peremptory challenges and in the case of five to six alternates,

each party receives three additional peremptory challenges. CR 47(b). Thus, Civil Rule 47(b) also contemplates that alternate jurors are treated in the same manner as regular jurors during voir dire.

Several local superior court rules are consistent with selecting alternate jurors as part of the voir dire process. A few local rules refer to the "struck jury" method. A struck jury is "[a] jury selected by allowing parties to alternate in striking from a list any person whom a given party does not wish to have on the jury, until the number is reduced to the appropriate number (traditionally 12)." BLACK'S LAW DICTIONARY 935 (9th ed. 2009). This manner of alternate juror selection would occur as part of the voir dire process. This is the jury selection method in Whitman, Pacific, Thurston, Asotin, Columbia, and Garfield Counties. *See* WHITMAN COUNTY SUPER. CT. LOCAL CIV. R. 47(a); PACIFIC COUNTY SUPER. CT. LOCAL R. 4; THURSTON COUNTY STRUCK JURY HANDBOOK, available at www.co.thurston.wa.us/superior/documents/ Struck%20Jury%20Handbook.pdf; HELLS CANYON CIRCUIT LOCAL R. 7(B).

Other local court rules provide more varying methods for alternate juror selection. In Grant County civil cases, jurors are assigned roster numbers and are then eliminated through usual for-cause and peremptory challenges. GRANT COUNTY SUPER. CT. LOCAL CIV. R. 47(c). The remaining 12 jurors with the lowest roster numbers become the jury and the remaining jurors with the next lowest roster numbers are seated as alternate jurors. GRANT COUNTY SUPER. CT. LOCAL CIV. R. 47(c). In Okanogan Superior Court, parties may stipulate that an alternate juror be designated by random drawing following closing arguments, "[i]n lieu of the procedure designated by statute." OKANOGAN COUNTY SUPER. CT. LOCAL R. 9(b). Presumably, the "procedure designated by statute" is the procedure employed by former RCW 10.49.070, discussed above. In Kitsap County, the clerk assigns all jurors random numbers beginning with

the number one.[6]  KITSAP COUNTY SUPER. CT. LOCAL CIV. R. 47(1).  Generally alternates are questioned during voir dire in the same way as regular jurors.  KITSAP COUNTY SUPER. CT. LOCAL CIV. R. 47(1)(C), (3)–(4).

Taken together, both the historic and current practices in Washington reveal that the procedure for selecting alternate jurors, like the selection of regular jurors, generally occurs as part of voir dire in open court.  As our Supreme Court has recognized, voir dire has traditionally been and must continue to be open to the public.  *See State v. Momah*, 167 Wn.2d 140, 148, 217 P.3d 321 (2009); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 804, 100 P.3d 291 (2004); *see also Press-Enters. Co. v. Superior Court*, 464 U.S. 501, 505, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984).  Thus, even though various Washington courts might employ slightly differing methods to select alternate jurors, we conclude that the Washington experience of alternate juror selection is one connected to the voir dire process for jury selection.  Therefore, alternate juror selection, under our experience, has been and continues to be publicly open.

2. Considerations of "logic" indicate that a drawing of alternate jurors implicates the core concerns of the constitutional right to public trial

Turning to the logic prong of the experience and logic test, our inquiry focuses on the purposes of the public trial right and the constitutional assurance of open courts.  Washington courts have recognized these purposes as ensuring a fair trial, reminding court officers of the importance of their duties, encouraging witnesses to come forward, and discouraging perjury.  *Sublett*, 176 Wn.2d at 72; *Brightman*, 155 Wn.2d at 514.  Two of the purposes of the public trial right are implicated in this case:  basic fairness to the defendant and reminding the trial court of the importance of its functions.

---

[6] If the defendant objects to this procedure, the clerk will draw the numbers in open court at the beginning of trial.  KITSAP COUNTY SUPER. CT. LOCAL CIV. R. 47(1).

At least three times before and during trial, the trial court indicated that it would randomly draw alternate jurors at the trial's conclusion. *See* 1 Verbatim Report of Proceedings (VRP) at 35 ("If we are not going to tell [the jurors that they are alternates], then it's random and we pull it out of the rotating cylinder, and it's whoever is left is who is eligible to be selected out."); 23 VRP at 3808 ("[The drawing] will be random. The box to be spun looks a little like an old fashioned bingo, but it's wooden. [The court clerk] has all 16 of your juror numbers, and after all of the closing arguments she will tell me which four numbers have been selected at random. We don't know now."); 25 VRP at 4061 ("[F]our jurors number [sic] were pulled randomly, and at this time I am temporarily excusing these four jurors . . . ."). But a court staff member conducted the drawing during an afternoon court recess, which was announced to Jones, counsel, and the jurors after it occurred. Thus, the alternate juror drawing occurred off the record and outside of the trial proceedings.

Although we do not suggest that the alternate juror drawing in this case was anything but random—and Jones does not appear to argue otherwise—there is simply no way to tell how the drawing was performed. The issue is not that the drawing in this case was a result of manipulation or chicanery on the part of the court staff member who performed the task, but that the drawing could have been. Where such a drawing occurs during a court recess off the record, the defendant and the public lack the assurance of a truly random drawing that they would have if the drawing were performed in open court on the record. This lack of assurance raises serious questions regarding the overall fairness of the trial, and indicates that court personnel should be reminded of the importance of their duties. Accordingly, we conclude that considerations of logic "implicate the core values the public trial right serves." *Sublett*, 176 Wn.2d at 72.

B.  The Trial Court Failed to Perform a *Bone-Club* Analysis, Resulting in an Error that Is Presumed Prejudicial, Entitling Jones to a New Trial

Having determined that both experience and logic require that an alternate juror drawing be conducted in open court, Jones's public trial right attaches. *Sublett*, 176 Wn.2d at 73. Thus, the trial court was required to consider the *Bone-Club* factors[7] before permitting the alternate juror drawing off the record.

"The trial court's failure to consider and apply *Bone-Club* before closing part of a trial"—the alternate juror drawing—was error. *Wise*, 176 Wn.2d at 13. "Violation of the public trial right, even when not preserved by objection, is presumed prejudicial to the defendant on direct appeal." *Wise*, 176 Wn.2d at 17. Permitting a violation of the public trial right to go unchecked "would erode our open, public system of justice and could ultimately result in unjust and secret trial proceedings." *Wise*, 176 Wn.2d at 18.

---

[7] Under *Bone-Club*, trial courts must consider five factors prior to closing the proceedings:

> 1.  The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.

> 2.  Anyone present when the closure motion is made must be given an opportunity to object to the closure.

> 3.  The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

> 4. The court must weigh the competing interests of the proponent of closure and the public.

> 5. The order must be no broader in its application than necessary to serve its purpose.

128 Wn.2d at 258-59 (alteration in original) (quoting *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)).

In *Wise*, our Supreme Court noted that ""[t]he remedy should be appropriate to the violation."" *Wise*, 176 Wn.2d at 19 (alteration in original) (quoting *Bone-Club*, 128 Wn.2d at 262 (quoting *Waller v. Georgia*, 467 U.S. 39, 50, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984))). The court went on to state that where the violation in question occurs as part of an "easily separable part of a trial," remand for a public hearing, rather than for a new trial, might be appropriate. *Wise*, 176 Wn.2d at 19. But where "the jury would necessarily be differently composed and it is impossible to speculate as to the impact of that on [the] trial," the appropriate remedy is a new trial. *Wise*, 176 Wn.2d at 19. Therefore, we hold that the violation of the public trial right entitles Jones to a new trial.

II. Drawing Alternate Jurors Outside of Jones's Presence Did Not Violate His Right to Be Present or to Appear and Defend Under the Federal or State Constitutions

In addition to his public trial claims, Jones contends that by allowing the random juror drawing to be done outside his presence, the trial court violated his constitutional right to be present under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment and under article I, section 22 of the Washington Constitution. Because the random jurors selection was not a critical phase of Jones's trial and did not have any effect on his substantial rights, we hold that no violation of his right to be present occurred. Moreover, even if Jones's trial suffered from error on this point, the error was harmless beyond a reasonable doubt.

Like the public trial right, the right to be present is a constitutional question under the Confrontation Clause and Due Process Clause of the Sixth and Fourteenth Amendments, respectively. Article I, section 22 of the Washington Constitution protects a criminal defendant's right to "appear and defend." Constitutional questions are reviewed de novo. *State v.*

14

*McCuistion*, 174 Wn.2d 369, 387, 275 P.3d 1092 (2012). We review Jones's right-to-be-present claim under the federal constitution and the state constitution in turn.

### A. Jones's Right to Be Present Was Not Violated Under the Due Process Clause of the Fourteenth Amendment

Washington courts apply federal constitutional law to asserted violations of defendants' rights to be present at trial. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011); *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 920, 952 P.2d 116. Although the right to be present originated in the Confrontation Clause of the Sixth Amendment, the United States Supreme Court has applied the Due Process Clause of the Fourteenth Amendment in situations where defendants are not actually confronting witnesses or evidence against them. *See United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985) (per curiam); *Rushen v. Spain*, 464 U.S. 113, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983).

The defendant's presence is constitutionally required "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934), *overruled in part on other grounds sub nom. Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964); *see also Gagnon*, 470 U.S. at 526. Because the defendant's presence must be reasonably substantially related to his or her ability to defend, the right is not triggered where "presence would be useless, or the benefit but a shadow." *Snyder*, 291 U.S. at 106-07.

The random drawing of jurors' names to determine which would be alternates was not a critical phase of the trial. Jones had the opportunity during voir dire to question, challenge, and ultimately select all the jurors, including those who were randomly selected as alternates, well before the alternate drawing. Although the initial juror selection is "a critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present," *Gomez*

*v. United States*, 490 U.S. 858, 873, 109 S. Ct. 2237, 104 L. Ed. 2d 923 (1989), voir dire vastly differs from the administrative function of later randomly selecting alternate jurors. Although this selection violated Jones's public trial right, nothing about the alternate juror selection had any relation, let alone a reasonably substantial one, to Jones's ability to defend against the attempted murder charge.

Jones relies on *Irby* for the proposition that any selection of jurors, even alternate jurors at the end of trial, implicates his due process rights. In *Irby*, the judge, prosecution, and defense exchanged e-mails regarding juror responses to the juror questionnaire, including possible dismissals of jurors for hardship and for cause. 170 Wn.2d at 878, 884. When these e-mails were sent, Irby was in jail and his attorneys never communicated with him regarding the contents of the e-mails. *Irby* 170 Wn.2d at 884. Noting that the right to be present during jury selection attaches when the work of empanelling the jury begins, the court held that because e-mails regarding jury selection were part of empanelment, "conducting jury selection [by e-mail] in Irby's absence was a violation of his right under the due process clause." *Irby* 170 Wn.2d at 884.

Notably, *Irby* involves the defendant's right to be present during the initial jury selection, not the alternate juror drawing at the trial's end. Unlike *Irby*, at the time alternates were excused, Jones's jury had been empanelled and present at his trial for more than five weeks. Jones's situation simply does not implicate the right to be present addressed in *Irby*. We hold that the alternate juror selection was not a critical stage that triggered Jones's right to be present under the Due Process Clause of the United States Constitution.

B. The Alternate Juror Drawing Did Not Violate Jones's Right to Appear and Defend Under Article I, Section 22 of the State Constitution

Article I, section 22 of the Washington Constitution provides that "[i]n criminal prosecutions the accused shall have the right to appear and defend in person." In *Irby*, our

Supreme Court recognized that the state constitutional right to appear and defend is arguably broader than the federal due process right to be present. 170 Wn.2d at 885 n.6. The *Irby* court based this determination in part on *State v. Shutzler*, 82 Wash. 365, 367, 144 P. 284 (1914), *overruled in part on other grounds by State v. Caliguri*, 99 Wn.2d 501, 664 P.2d 466 (1983), in which the Supreme Court stated that "it is the right of the accused to be present at every stage of the trial when his substantial rights may be affected." Thus, in Washington, the right to appear and defend as guaranteed by article I, section 22 of the Washington Constitution is triggered at any time during trial that a defendant's substantial rights may be affected.

The alternate juror drawing in this case is not one of those times. As already discussed, Jones had the opportunity to participate in the selection of 16 jurors during voir dire. After the excusal of four jurors, any variation in the makeup of the remaining jurors should have been satisfactory to Jones, regardless of whether he was present when the selection of alternates occurred. *See State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995) (holding that because "[t]he Defendant participated in [the jurors'] selection and the entire panel, both regular jurors and alternates, was ultimately accepted by the Defendant," the fact that an alternate mistakenly deliberated in the case caused no prejudice). The trial court's alternate juror selection procedure therefore did not violate Jones's right to appear and defend under article I, section 22 of the Washington Constitution.

    C. Jones's Absence at the Time Alternate Jurors Were Drawn, if Error at All, Was Harmless Error Beyond a Reasonable Doubt

Both the federal due process right to be present and the state constitutional right to appear and defend are subject to harmless error analysis. *Rushen*, 464 U.S. at 117-18; *Irby*, 170 Wn.2d at 885-86. "The burden of proving harmlessness is on the State and it must do so beyond a

reasonable doubt." *Caliguri*, 99 Wn.2d at 509. "Nonetheless, the defendant must first raise at least the possibility of prejudice." *Caliguri*, 99 Wn.2d at 509.

Jones does not demonstrate a possibility of prejudice. He participated in and accepted the selection of 16 jurors, knowing that only 12 of them would ultimately deliberate. Because 12 of them did actually deliberate and come to a verdict—exactly as Jones expected—Jones cannot now say that the fact that he was not present at the time of the random selection of the 12 deliberating jurors prejudiced him. Even if Jones's absence during the random selection of alternate jurors was error, the error was harmless.

Our Supreme Court's recent decisions on the public trial right have decided this case for us. Because Jones's right to a public trial was violated when alternate jurors were selected during a court recess off the record, we must presume Jones was prejudiced. However, we reject Jones's claimed error with regard to his right to be present at the time the alternate juror drawing occurred. We vacate the trial court's conviction of Jones for attempted first degree murder and remand this matter for a new trial.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

III. THE PHOTO IDENTIFICATION PROCEDURE, ALBEIT SUGGESTIVE, WAS RELIABLE AND PROPERLY GIVEN TO THE JURY TO WEIGH

Jones contends that the admission of Trooper Johnson's photo identification of Jones violates his due process rights. First, Jones asserts that the photo identification procedure was impermissibly suggestive. We agree and hold that the photo identification procedure employed by law enforcement officers was unduly suggestive. Second, Jones asserts that the procedure was unreliable because it was substantially likely to result in an irreparable misidentification

under the totality of the circumstances. On this point, we disagree with Jones and hold that Trooper Johnson's photo identification of Jones was reliable enough to be considered by the jury.

"Admission of a photo identification or a photomontage is, reduced to its essence, the admission of evidence in a criminal case" and is therefore "subject to the sound discretion of the trial court." *State v. Kinard*, 109 Wn. App. 428, 432, 36 P.3d 573 (2001). Instead of making independent evaluations where constitutional issues are at play, appellate courts determine whether substantial evidence supports trial court's findings. *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994). We thus review the trial court's order denying the suppression of Trooper Johnson's eyewitness identification for abuse of discretion and substantial evidence.[8]

A. The Photo Identification Procedure Was Unduly Suggestive

Jones bears the burden of showing that the photographic identification procedures employed by law enforcement were impermissibly suggestive. *State v. Vickers*, 148 Wn.2d 91, 118, 59 P.3d 58 (2002). A photographic identification meets the strictures of due process if it is not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). The *Simmons* court provided several factors that may result in a high likelihood of misidentification, including where the witness has only a brief chance to observe the criminal, sees him under poor conditions, sees "only the picture of a single individual who generally resembles the person he saw," or sees only "the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized." *Simmons*, 390 U.S. at 383.

---

[8] The trial court denied the suppression of Trooper Johnson's eyewitness identification based on stipulated evidence presented by the parties. *See* App. A to Br. of Appellant.

Under these statements of the law, we conclude that the procedures employed here were impermissibly suggestive. The parties stipulated that following the shooting, Trooper Johnson made the following statements regarding how well he saw the man who shot him: "I got a good look at him"; "diligent attention"; "did not get a good look at the shooter"; "mostly saw a side profile." These stipulated statements are at best inconsistent. On February 13, 2010, while Trooper Johnson was recuperating at OHSU, Portland police showed him a single photograph of a white male. Trooper Johnson indicated that he could not be "100% sure" that this was the shooter, but indicated that the photograph resembled the shooter. Police later showed Trooper Johnson a sketch based on another witness's description and Trooper Johnson indicated that the sketch did not look like the shooter. About an hour later, police showed Trooper Johnson a black-and-white, poor quality copy of Jones's Department of Licensing photo; Trooper Johnson requested a clearer copy. He was shown another photograph of a different man 45 minutes later. Three hours after that, police showed Trooper Johnson a montage with six photos, none of which was of Jones, and he responded that none of the men in the photos was the shooter. The next day, police showed Trooper Johnson six different photos throughout the day, none of which was of Jones; Trooper Johnson did not identify any as the shooter.

In the two-day period during which he was presented with these photographs, Trooper Johnson had the name "Marty" and a phone number written on his hand from when he stopped Susan Jones's minivan. Trooper Johnson twice asked to see a photograph of Susan Jones's husband. On the afternoon of February 14, 2010, Trooper Johnson was shown a clear, color photo of Jones's Department of Licensing photograph which Trooper Johnson identified as the

shooter.[9] Later that day, after Trooper Johnson had identified a photograph of Jones as the shooter, a sketch artist met with Trooper Johnson to complete a composite sketch of the shooter. Sometime later on the same day, detectives who were unaware of Trooper Johnson's previous identification of Jones presented another photo montage to Trooper Johnson that included Jones's photo. Trooper Johnson indicated that Jones's photo "look[ed] very much similar to the gentleman [he] saw."

Throughout the time that police officers showed Trooper Johnson photographs to determine who the shooter was, he repeatedly requested photos of Susan Jones's husband, suspecting that Jones was involved in the shooting. He was shown several single photographs, including several pictures of Jones. The picture he identified as Jones likely had Jones's name printed on it. Then he identified Jones from a photo montage after having already identified him from a single photograph. The identifications were made after Trooper Johnson made inconsistent statements about his ability to identify Jones. This all leads us to conclude that the photo identifications employed by law enforcement in this case were impermissibly suggestive.

B. Despite Suggestiveness, the Photo Identification Procedure Was Reliable Enough to Be Given to the Jury

Even though several aspects of the photo identification procedures were suggestive, the reliability of the identification, considering the totality of the circumstances, controls the determination of whether the procedures created a substantial likelihood of irreparable misidentification. *Manson v. Brathwaite*, 432 U.S. 98, 113-14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). In other

---

[9] Based on the photocopy of the Department of Licensing photograph attached to the parties' stipulation, it appears that Jones's name and identifying information was printed below the photograph.

words, if the identification is reliable, it cures the suggestive nature of the confrontation procedure.

The United States Supreme Court has provided several factors to determine the identification's reliability, "includ[ing] the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Brathwaite*, 432 U.S. at 114; *Biggers*, 409 U.S. at 199-200. Based on the facts presented in the parties' stipulation, the trial court carefully weighed each of these factors in its order denying Jones's motion to suppress Trooper Johnson's identification. It determined that the there was no substantial likelihood of irreparable misidentification. We hold that the trial court did not abuse its discretion by reaching this determination.

Furthermore, in *Brathwaite*, the United States Supreme Court indicated that the reliability of eyewitness identification was best left to the jury:

> [S]uch evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

432 U.S. at 116. The trial court permitted evidence of Trooper Johnson's eyewitness identification, noting that any defects in the evidence go to the evidence's weight, not its admissibility. It did not abuse its discretion in doing so. We hold that the trial court appropriately allowed the prosecution to present eyewitness identification evidence, leaving for the jury the question of how much credence such evidence deserved.[10]

---

[10] The State also asserts that there were exigent circumstances that "necessitated showing Trooper Johnson photographs as expeditiously as possible." Br. of Resp't at 38. The trial court also found that exigent circumstances required identification procedures that could otherwise have been less suggestive. Jones did not assign error to this finding. "Unchallenged findings are

C. The Trial Court Was Not Required to Give a Cautionary Instruction Regarding the Unreliability of Eyewitness Identification

In his SAG, Jones argues that the trial court should have given a cautionary instruction to the jury to warn of the problems inherent in eyewitness identifications. He relies on the Court of Appeals' discussion of this issue in *State v. Allen*, 161 Wn. App. 727, 255 P.3d 784 (2011), *aff'd*, ___ Wn.2d ___, 294 P.3d 679 (2013). We hold that it was unnecessary to give a cautionary instruction in this case.

The Court of Appeals in *Allen* recognized the dangers of eyewitness identification, noting that "[m]istaken eyewitness identification is a leading cause of wrongful conviction." 161 Wn. App. at 734.[11] Our Supreme Court echoed these concerns in its *Allen* opinion noting that the "'vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.'" 294 P.3d at 682 (quoting *United States v. Wade*, 388 U.S. 218, 228, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967)).

The Supreme Court in *Allen* discussed how varying jurisdictions address problems in eyewitness identification, noting that while some courts leave eyewitness jury instructions to the trial court's discretion, others specifically disallow such instructions as impermissible comment on the evidence. 294 P.3d at 683-84 (comparing *United States v. Sambrano*, 505 F.2d 284 (9th Cir. 1974), with *State v. Valencia*, 118 Ariz. 136, 575 P.2d 335 (Ct. App. 1977)). Ultimately, the court determined that a jury instruction on eyewitness identification is neither inappropriate nor required for due process reasons. *Allen*, 294 P.3d at 684-85. Uncertain that such a cautionary instruction solves the unreliability problem inherent in eyewitness identifications "any more than

---

verities on appeal." *In re Dependency of M.S.R.*, 174 Wn.2d 1, 9, 271 P.3d 234 (2012). Thus, the issue of exigent circumstances is not before us.

[11] We note that *Allen* was primarily concerned with cross-racial identification, which is not at issue in this case. *See* 161 Wn. App. at 735; 294 P.3d at 682-87.

would cross-examination, expert evidence, or arguments to the jury," *Allen*, 294 P.3d at 685, the *Allen* court left the determination on whether to give a cautionary jury instruction to the trial court's discretion. *Allen*, 294 P.3d at 686-87.

In any event, at trial, Jones had an opportunity to present the testimony of Dr. Geoffrey Loftus, an expert in experimental psychology, who testified at some length regarding the unreliability of eyewitness identification. Because this testimony called into question the reliability of Trooper Johnson's eyewitness identification of Jones, we hold that a cautionary jury instruction on the reliability of eyewitness identification was unnecessary.

## IV. THE TRIAL COURT DID NOT ERR IN MAKING EVIDENTIARY RULINGS

We turn next to Jones's challenge to three evidentiary rulings: the trial court's denial of Jones's motion to present evidence that another suspect might have shot Trooper Johnson; the trial court's exclusion of an e-mail sent by a supervisor at the Washington State Patrol Crime Lab stating that the investigation was "haphazard"; and the trial court's denial of Jones's motion to exclude bunter mark evidence, allowing the State to present expert testimony on the matter.[12]

We review a trial court's decision on admission or exclusion of evidence for abuse of discretion. *In re Det. of Coe*, 175 Wn.2d 482, 492, 286 P.3d 29 (2012); *Diaz v. State*, 175 Wn.2d 457, 462, 285 P.3d 873 (2012). "Thus, the trial court's decision will be reversed only if no reasonable person would have decided the matter as the trial court did." *State v. Thomas*, 150 Wn.2d 821, 856, 83 P.3d 970 (2004). We may review de novo an alleged denial of the Sixth Amendment right to present a defense, but only if the evidence is material and even then only if the defendant's need to present the evidence outweighs the State's interest in precluding the evidence. *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

---

[12] Bunter mark evidence involves a logo stamped on the shell casing of a bullet using a bunter, a metal tool that impresses a letter or character onto the base of a cartridge case.

A. The Trial Court Did Not Abuse Its Discretion by Disallowing Other Suspect Evidence

Jones argues that the trial court violated his constitutional right to present a defense by excluding Trooper Greene's testimony that Greene saw an individual walk by when he stopped Susan Jones's car. According to Jones, Trooper Green's description of this individual matched the description given by George Hill, the tow truck operator, who was present at the time of the shooting. The court ruled that Trooper Greene could not testify about seeing another individual unless the defendant was able to show the necessary foundation connecting another suspect to the shooting. The trial court did not abuse its discretion in so ruling.

The Sixth Amendment to the United States Constitution provides in pertinent part that in "all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." The United States Supreme Court has held that "[j]ust as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). However, this right is not absolute. *State v. Smith*, 101 Wn.2d 36, 41, 677 P.2d 100 (1984). A criminal defendant has no constitutional right to present irrelevant evidence. *Thomas*, 150 Wn.2d at 857; *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983).

Under Washington law, "[w]hen there is no other evidence tending to connect another person with the crime, such as his bad character, his means or opportunity to commit the crime, or even his conviction of the crime, such other evidence is irrelevant to exculpate the accused." *Thomas*, 150 Wn.2d at 857. Our Supreme Court's decision in *State v. Downs*, 168 Wash. 664, 13 P.2d 1 (1932), is instructive. There, the court upheld the exclusion of evidence that a well-known burglar was in Seattle on the night of a burglary. *Downs*, 168 Wash. at 665-66. The mere fact

that another burglar was in Seattle on the same night of the subject burglary was not a "circumstance[] tending in some manner to connect him with the commission of the crime." *Downs*, 168 Wash. at 668. Defendants must show more than mere opportunity to commit the crime because such evidence is "'the most remote kind of speculation.'" *Thomas*, 150 Wn.2d at 857 (quoting *Downs*, 168 Wash. at 668).

Jones's proposed presentation of Trooper Greene's testimony would have shown only that when Trooper Greene stopped Susan Jones's car, Greene saw someone else on the street who may have had an opportunity to shoot Trooper Johnson. But 40 minutes elapsed between Trooper Greene's observation and the shooting. Thus, Trooper Greene's testimony would not demonstrate the required connection between the person Trooper Greene saw and the shooter, only that this other person walked by 40 minutes earlier. The trial court did not abuse its discretion by excluding Trooper Greene's observation of the unidentified pedestrian.

Jones argues that *State v. Maupin*, 128 Wn.2d 918, 913 P.2d 808 (1996), a case involving the constitutional right to call witnesses to support the defense, compels a different result. In *Maupin*, the defendant sought to elicit testimony from a witness who saw the girl that the defendant allegedly raped and murdered with another person *after* the rape and murder were supposed to have taken place under the State's theory. *Maupin*, 128 Wn.2d at 922. Our Supreme Court held that the witness's testimony went beyond speculation about mere motive or opportunity that someone else committed the crime because the witness "would have testified he saw the kidnapped girl with someone other than the defendant *after the time of kidnapping*." *Maupin*, 128 Wn.2d at 928 (emphasis added). Unlike *Maupin*, in which the defendant demonstrated the necessary nexus between another suspect and the crime, here Jones's argument boils down to the mere presence of another person on a public street who may have had the opportunity to shoot Trooper Johnson. This other-suspect evidence is irrelevant to exculpate

26

Jones. We hold that the trial court's exclusion of this evidence did not violate Jones's constitutional right to present a defense.[13]

B. The Trial Court Did Not Abuse Its Discretion by Excluding the Testimony of Washington State Patrol Crime Lab Supervisor Chris Sewell

Jones sought to present the testimony of Chris Sewell, a Washington State Patrol Crime Lab supervisor, who had sent an e-mail calling the police investigation of Trooper Johnson's shooting "haphazard." Jones planned to use this e-mail to impeach the State crime lab's fingerprint analyst. Sewell's general e-mail regarding the police investigation being haphazard had nothing specifically to do with the fingerprint analysis of various items that was performed by the State's fingerprint analyst. The e-mail was not offered for any purpose pertaining to fingerprint analysis. Therefore, if permitted, the e-mail would have constituted impeachment on a collateral matter. *See State v. Alexander*, 52 Wn. App. 897, 901-02, 765 P.2d 321 (1988) ("Contradictory or impeaching testimony is collateral if it could not be shown in evidence for any purpose independent of contradiction."). Thus, we hold that the trial court's exclusion of this impeachment evidence was not an abuse of discretion and did not implicate Jones's Sixth Amendment right to present a defense.

The evidence of Sewell's opinion of the investigation was also properly excluded under ER 403 because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Although perhaps relevant to the general quality of the police investigation, the generality of Sewell's comments minimize their probative value. Allowing a crime lab supervisor to openly and generally criticize the entire

---

[13] In his SAG, Jones asserts that the State was permitted to state that all other suspects were cleared, despite the lack of investigation of all 1600 tips called in from citizens. Even if Jones's assertion is true, Jones fails to demonstrate that any of these tips demonstrate the necessary connection between another suspect and Trooper Johnson's shooting.

police investigation through an opinion that it was haphazard would have elicited an emotional, rather than rational, response among the jurors. Furthermore, after hearing testimony from several Washington State Patrol troopers, as well as from forensic specialists involved in the investigation, Sewell's testimony at a late trial stage could have misled or at best have confused the jury. Therefore, we hold that the trial court did not abuse its discretion excluding Sewell's testimony. We also hold that this exclusion of evidence did not impinge Jones's ability to present a defense. After all, Jones had ample opportunity to cross-examine the State's forensic witnesses and present his own forensic witnesses.

C. The Trial Court Did Not Abuse Its Discretion by Admitting Evidence of Bunter Marks on the Shell Casings

At trial, the court permitted the State to present expert testimony comparing bunter marks on the base of shell casings found at the crime scene to shell casings found in Jones's home. The defense moved to exclude this evidence, arguing that it was pseudoscientific and novel and therefore required a *Frye*[14] hearing. To the contrary, bunter mark evidence is not a novel science under *Frye*. The trial court did not abuse its discretion by permitting expert testimony on bunter mark evidence.

Under *Frye*, new and untried scientific procedures will not be admitted into evidence unless and until the underlying scientific principles on which the procedures are based are "sufficiently established to have gained general acceptance in the particular field in which [they] belong[]." 293 F. at 1014. The "*Frye* test is not implicated if the theory and the methodology relied upon and used by the expert to reach an opinion . . . is generally accepted by the relevant scientific community." *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 597, 260 P.3d 857 (2011). When *Frye* is not implicated, the trial court simply determines whether the evidence

---

[14] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

is admissible under the two-part ER 702 test: (1) does the witness qualify as an expert and (2) does the witness's testimony assist the trier of fact to understand the evidence. *See State v. McPherson*, 111 Wn. App. 747, 761, 46 P.3d 284 (2002).

Bunter mark evidence—and firearm ballistics evidence generally—is hardly novel or untried. Although there is no reported Washington appellate case on this issue, numerous courts around the country have permitted firearm ballistic evidence, noting that it is an established science. *See, e.g., United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) (holding that government expert's firearms identification methodology matching particular guns to particular bullets was not pseudoscience); *United States v. Hicks*, 389 F.3d 514, 526 (5th Cir. 2004) (holding that matching ballistics testing of shell cases is accepted methodology); *Fleming v. State*, 194 Md. App. 76, 1 A.3d 572, 586, 590 (2010) (holding microscopic "[f]irearms toolmark identification" and analysis is generally accepted in scientific community); *Al Amin v. State*, 278 Ga. 74, 597 S.E.2d 332, 344 (2004) (holding that ballistic and tool marks evidence is not novel). Because bunter mark evidence, like other firearm ballistics evidence, is generally accepted in the relevant scientific community, *Frye* was not implicated here and the trial court was not required to hold a *Frye* hearing.

In this case, the trial court determined that the State's expert had the requisite experience and knowledge. He was a scientist trained as a firearms examiner who had examined over 3000 cases in South Africa and the United States. The trial court also determined that bunter mark evidence was beyond the general knowledge of laypersons and would thus assist the trier of fact in evaluating such evidence. In making this evidentiary ruling under ER 702, we hold that the trial court did not abuse its discretion.

V.    THE ADDITIONAL ISSUES RAISED IN JONES'S SAG LACK MERIT

Jones raises several other issues in his pro se SAG. None has merit.

A. Affidavit of Prejudice and Disqualification of Judge

Jones contends that he was denied his right to file an affidavit of prejudice against Judge Hogan at Pierce County Superior Court. He also argues that Judge Hogan should have been disqualified because her husband is a retired police officer. These arguments lack merit.

When Jones sought to file his affidavit of prejudice against Judge Hogan, he had already filed another affidavit of prejudice against Judge Pomeroy in Thurston County Superior Court. Criminal defendants may file but one affidavit of prejudice. Because Jones had already filed an affidavit against Judge Pomeroy, Judge Hogan properly denied Jones's affidavit of prejudice against her.

Jones asserts that Judge Hogan's impartiality is questionable because she is married to a retired police officer. Though Judge Hogan's husband was a police officer, he was not a party or witness in Jones's trial. In the order denying disqualification, Judge Hogan indicated that she had "presided over superior court trials for 18 years, 85% of which were criminal cases investigated by police" and that she had "no personal bias or interest in the outcome of this case." Clerk's Papers at 1249. Jones fails to demonstrate a valid reason for Judge Hogan's disqualification.

B. Speedy Trial

Jones asserts that the several venue transfers in this case infringed his right to a speedy trial. However, when Jones's case was transferred from Pacific County to Pierce County, Jones waived his speedy trial right, allowing his trial to begin on or before February 28, 2011.[15] Jones's trial started in Pierce County on January 12, 2011, so his speedy trial claim fails.

---

[15] Jones first executed a speedy trial waiver in February 2010 upon the parties' joint motion to continue the trial to October 2010. In July 2010, Jones moved for a change of venue; in August 2010 the court transferred venue to Thurston County on the understanding that Jones would have to waive speedy trial, with trial to begin before February 28, 2011. Jones executed this waiver.

C. Excessive Bail

Jones argues that the court excessively set bail at $5 million. The amount of bail is "a matter within court discretion to be reversed on appeal only for manifest abuse." *State v. Reese*, 15 Wn. App. 619, 620, 550 P.2d 1179 (1976); *see also State v. Jakshitz*, 76 Wash. 253, 254-55, 136 P. 132 (1913). Although $5 million is a high amount, the trial court heard arguments regarding the setting of bail on two different occasions. Jones stood accused of shooting a trooper and there was some evidence that he posed a flight risk. Thus, Jones fails to demonstrate that the trial court's setting of bail at $5 million was manifest abuse.

D. Errors in Warrant

Jones claims that there were several problems with the warrants issued in this case. Throughout the police investigation, several search warrants issued allowing police to search Jones's homes, his vehicles, his phone records, and his DNA (deoxyribonucleic acid). Before trial, Jones's counsel moved for a hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), arguing that the warrants were based on affidavits that were intentionally or knowingly false or made in reckless disregard for the truth. Under *Franks*, there is always "a presumption of validity with respect to the affidavit supporting the search warrant." 438 U.S. at 171.

Jones fails to show that the affidavits supporting the search warrants included information that was deliberately false or made in reckless disregard of the truth. We are tolerant of some mistaken facts in search warrant applications and have held that perfect descriptions are not required. *State v. Boyer*, 124 Wn. App. 593, 603, 102 P.3d 833 (2004). And even if some of the statements in the warrant affidavits were deliberately false, Trooper Johnson's eyewitness identification of Jones alone established probable cause. Jones was not entitled to an evidentiary *Franks* hearing.

E. Errors at Probable Cause Hearing

Jones also argues that the prosecutor made false or misleading statements at the probable cause hearing. Jones bases his argument on objections that his attorney made. But his counsel's only objection was to request a *Gerstein*[16] hearing because the initial probable cause statement indicated that neither of the shooting's witnesses could identify Jones as the shooter. However, Trooper Johnson had identified Jones as the shooter at the time of the probable cause hearing. Therefore, we agree with the trial court that no *Gerstein* hearing was required.

F. Violations of *Miranda*[17] Rights

Jones contends that interrogating officers did not honor his requests for an attorney during interrogation. Jones is correct: officers continued to question Jones after he had unequivocally invoked his right to counsel by requesting an attorney in violation of *Miranda* and its progeny. *See State v. Radcliffe*, 164 Wn.2d 900, 906, 194 P.3d 250 (2008) ("Once waived, a suspect may ask for an attorney at any time. If he requests an attorney, all questioning must stop until he has an attorney or starts talking again on his own."). But the trial court granted Jones the appropriate remedy by suppressing all of Jones's statements after he unequivocally requested an attorney. Jones has no error of which to complain.

G. Evidence Tampering

Jones makes several ambiguous claims in his SAG. These are bald, unsubstantiated assertions.

Jones asserts that the court erred in not allowing the ammunition inventory lists from his home to be admitted into evidence when it allowed the State to submit "misleading" phone

---

[16] *Gerstein v. Pugh*, 420 U.S. 103, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975).

[17] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 695 (1966).

records. Jones has not indicated what, if any, relation the inventory list has to the phone records. We decline to consider Jones's argument further.

Jones also complains that the testimony of Matt Olson, a federal Bureau of Alcohol, Tobacco and Firearms agent, who recovered ammunition from Jones's home, demonstrates that "evidence had been tampered with." But Jones says nothing more to indicate how evidence was tampered with and Olson's testimony sheds no additional light on Jones's claim. We need not further consider Jones's unsupported assertions.

### H. Time Constraint on Closing Argument

Jones asserts that the trial court improperly restricted the amount of time his attorney had for closing argument, causing his attorney to rush and miss key points. Jones's counsel was given at least as much time as he requested for closing arguments and received no pressure from the court to finish his closing. Therefore, we reject Jones's argument that his lawyer did not have sufficient time to make a closing argument.

### I. Disqualification of Juror

Jones contends that a juror should have been disqualified because her husband and the trial judge's husband were acquainted. But Judge Hogan asked the juror whether she thought the fact that their husbands were friends would affect her ability to be fair. The juror responded that she could be fair, and Jones's attorneys did not object or move to disqualify this juror. Thus, even if this was error, we decline to review this issue because it was not raised at trial. RAP 2.5.

### J. Instructional Errors Regarding Firearm Sentencing Enhancement

Jones argues that there was a jury instruction error with regard to sentencing enhancements. He cites *State v. Bashaw*, 169 Wn.2d 133, 234 P.3d 195 (2010), and *State v. Ryan*, 160 Wn. App. 944, 252 P.3d 895 (2011), ostensibly to argue that the trial court erred in instructing the jury that it must decide unanimously whether the firearm sentencing

enhancements applied. However, both *Bashaw* and *Ryan* were recently overturned on nonunanimity grounds. *State v. Nuñez*, 174 Wn.2d 707, 718, 285 P.3d 21 (2012). All jury findings on sentencing enhancements require unanimity in Washington. *Nuñez*, 174 Wn.2d at 713. Thus, Jones's challenge to the jury instructions is meritless.

## CONCLUSION

We reject Jones's claimed error with regard to his right to be present at the time the alternate juror drawing occurred. We, however, vacate Jones's conviction for attempted first degree murder. Our Supreme Court's recent decisions on the public trial right have decided this case for us. Because the trial court violated Jones's public trial right when the trial court clerk drew alternate jurors during a court recess off the record, we must presume Jones was prejudiced and therefore remand this matter for a new trial.

We affirm the trial court on all other grounds and reject Jones's claims regarding suggestive and unreliable eyewitness and photographic identification procedures, the trial court's various evidentiary rulings, and several other arguments Jones raises in his pro se SAG.

_____, J P T
WIGGINS, J.P.T.

We concur:

_____, A.C.J.
JOHANSON, A.C.J.

_____, J P T
BRIDGEWATER, J.P.T.

34