FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 JUN 18 AM 8: 36

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | No. 76371-7-I |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JUSTIN MATTHEW BACANI, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 18, 2018 |
| | ) | |

DWYER, J. — Justin Bacani was charged and convicted of murder in the second degree for the death of Annelise Harrison. On appeal, Bacani contends that the trial court erred by (1) refusing to admit hearsay statements concerning Harrison's sexual practices, (2) redacting a portion of a 911 call that was played for the jury, and (3) denying his request to instruct the jury on voluntary intoxication. Bacani also contends that he received ineffective assistance of counsel and that the prosecutor committed flagrant misconduct during closing argument, thus depriving him of a fair trial. Finding no error, we affirm.

I

The Ridgedale Apartments in Bellevue were undergoing major renovations in February 2015. On February 7, maintenance employees were inspecting apartment units and assessing the damage caused by a recent sewer backup. Although all of the apartment units should have been vacant,

maintenance employees discovered a woman's purse on the floor inside one of the apartments. The employees looked around the apartment and discovered the body of Annelise Harrison in the bathroom.

Police searched the apartment and discovered traces of blood on the walls in the bathroom, on the toilet, in the bathroom sink, and on the light switch of the bathroom. Police also discovered blood in the hallway, on the deadbolt of the front door, and in the cracks of the hallway flooring. There were black scuff marks on the hallway baseboards and fresh paint on Harrison's boots that was consistent with the paint from the baseboards. The smoke alarm in the apartment made a chirping sound because the battery was low.

Dr. Richard Harruff, chief medical examiner for the King County medical examiner's office, performed the autopsy. Dr. Harruff noted that Harrison had abrasions and contusions on her neck and blood spots on the surfaces of her eyes. Dr. Harruff concluded that Harrison died by strangulation sometime between February 1 and 2. Harruff also found that Harrison was under the influence of drugs at the time of her death but testified that "if she had died of a drug overdose, simply, then there wouldn't have been any bruising." Finally, Dr. Harruff determined that it was possible, though unlikely, that the injuries sustained from strangulation occurred more than a few hours before Harrison's death.

Police discovered a cell phone inside of Harrison's pants pocket. Detective Jennifer Robertson searched the cell phone and discovered that the last telephone call made from that phone was on February 1 at 8:21 p.m.

- 2 -

Robertson dialed that number and a man answered. The man identified himself as "Jesse" and stated that he did not know anyone named Annalise. Robertson asked the man if he recognized the telephone number that she was calling from. The man stated that he did not and then promptly ended the call.

Police reviewed Harrison's cell phone records and searched for video footage of buses traveling from Seattle to Bellevue. The search produced video footage showing Harrison and a man boarding a bus at Westlake Station on February 1 at 10:53 p.m. Video footage showed Harrison and the man exit together at the Bellevue transit center, enter a Walgreens store near the Ridgedale Apartments, exit Walgreens, and walk toward the Ridgedale Apartments.

Using the video footage and the telephone number that Harrison dialed shortly before her death, the police were able to determine that the man who identified himself as "Jesse" was, in fact, Justin Bacani. The police were able to utilize cell tower information and track Bacani from downtown Seattle to a tower near the Ridgedale Apartments. Police also discovered that Bacani had placed three 911 calls between February 1 and 2. These calls were placed at 12:13 a.m., 2:18 a.m., and 2:44 a.m., and came from near the Walgreens store and the Ridgedale Apartments. Following his arrest, DNA testing revealed that the blood found in the apartment matched Bacani.

Bacani was charged and convicted of murder in the second degree. The sentencing court found that Bacani was a persistent offender and sentenced him to a term of confinement for life. Bacani appeals.

II

Bacani first contends that his constitutional right to present a defense was violated. This is so, he asserts, because the trial court excluded hearsay statements that Harrison allegedly enjoyed engaging in sex acts that included strangulation.

We review an alleged denial of the constitutional right to present a defense de novo. State v. Lizarraga, 191 Wn. App. 530, 551, 364 P.3d 810 (2015), review denied, 185 Wn.2d 1022 (2016). "But a criminal defendant has no constitutional right to have irrelevant or inadmissible evidence admitted in his or her defense." State v. Aguilar, 153 Wn. App. 265, 275, 223 P.3d 1158 (2009). Rather, "[t]he defendant's right to present a defense is subject to 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" Lizarraga, 191 Wn. App. at 553 (quoting Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)).

> The hearsay rule
>
> has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury.

Chambers, 410 U.S. at 298. "[A]llowing inadmissible hearsay testimony 'places the [witness's] version of the facts before the jury without subjecting the [witness]

to cross-examination,' depriving the State 'of the benefit of testing the credibility of the statements' and denying the jury 'an objective basis for weighing the probative value of the evidence.'" Lizarraga, 191 Wn. App. at 558 (some alterations in original) (quoting State v. Finch, 137 Wn.2d 792, 825, 975 P.2d 967 (1999)). "A trial court's ruling on the admissibility of evidence will be disturbed on appeal only if there is an abuse of discretion." Aguilar, 153 Wn. App. at 275.

Here, Bacani sought to elicit testimony from three witnesses whom he stated would all testify that Harrison had expressed to them that she enjoyed "rough sex," "that she was into BDSM," and that "[s]he enjoyed to be choked during the sexual activity." The defense theory was that Harrison had died of a drug overdose and that the indications of strangulation found on her body were caused by a consensual sex act that preceded her death.

Bacani's counsel never indicated to the court when Harrison allegedly made the proffered statements or in what context the statements were made. Neither did defense counsel proffer any evidence that Harrison had sex—or engaged in the acts described—within the relevant window of time before her death.[1] Defense counsel conceded that the statements were hearsay and did not identify any exception to the hearsay rule that would make the statements admissible.

---

[1] Dr. Harruff testified that it was very unlikely that Harrison was strangled more than 12 hours before her death. Thus, in order for the proffered evidence to be relevant, it was incumbent on Bacani to establish that Harrison engaged in sex acts that included choking within the relevant time frame. However, there is no evidence that Harrison had sex at all the day that she died, let alone evidence that she engaged in choking during sex prior to her death.

The trial court recognized that the limited information provided was insufficient to make such evidence relevant. "Everything that you just told me related to sex. She may like to be choked during sex. She may have been engaged at some point in prostitution. If she hadn't been, if there is no evidence to suggest that she did either one of those things sufficiently close to her death, then that could have been the cause of those marks, then that is just pure speculation; isn't it?" Bacani was not able to provide any further information concerning the statements or evidence that Harrison had sex prior to her death. Accordingly, the trial court ruled that the statements were inadmissible. The ruling was not an abuse of the court's discretion.

Nevertheless, for the first time on appeal, Bacani asserts that the statements were admissible pursuant to the "then existing state of mind" hearsay exception. That exception permits the admission of:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

ER 803(a)(3).

Although Bacani contends that the statements allegedly made by Harrison fit "squarely within the hearsay exception," Br. of Appellant at 23, he entirely fails to identify *when* Harrison was supposed to have made these statements. Under ER 803(a)(3), "hearsay evidence is admissible if it bears on the declarant's state of mind and if that state of mind is an issue in the case." State v. Terrovona, 105 Wn.2d 632, 637, 716 P.2d 295 (1986). Without any indication of when Harrison

allegedly made the proffered statements, it is impossible to know whether Harrison's "then existing state of mind" was material.

Similarly, Bacani has not established that evidence concerning Harrison's preferred sexual practices was relevant. "To be relevant, evidence must meet two requirements: (1) the evidence must have a tendency to prove or disprove a fact (probative value), and (2) that fact must be of consequence in the context of the other facts and the applicable substantive law (materiality)." State v. Rice, 48 Wn. App. 7, 12, 737 P.2d 726 (1987). Statements made by Harrison that she enjoyed engaging in sex acts that included choking could be found to be probative, but they are not material absent evidence that Harrison engaged in such acts in close proximity to her death. Bacani proffered no such evidence. The out-of-court statements allegedly made by Harrison are thus lacking both temporality and materiality.

The trial court did not abuse its discretion by excluding the proffered evidence.[2]

---

[2] Bacani also contends that he received ineffective assistance of counsel because his counsel failed to identify the "then existing state of mind" hearsay exception. Bacani asserts that, had his counsel asserted the hearsay exception, Harrison's out-of-court statements would have been admitted.

"Constitutionally ineffective assistance of counsel is established only when the defendant shows that (1) counsel's performance, when considered in light of all the circumstances, fell below an objectively reasonable standard of performance and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." State v. Woods, 198 Wn. App. 453, 461, 393 P.3d 886 (2017) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Failing to satisfy either requirement ends the inquiry. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). The defendant bears the burden of demonstrating both deficient representation and prejudice. In re Det. of Hatfield, 191 Wn. App. 378, 401, 362 P.3d 997 (2015).

As discussed herein, Harrison's alleged statements lacked both temporality and materiality. There is no indication in the record of *when* the statements were made and there is no evidence that Harrison engaged in such conduct in close proximity to her death. Even assuming that defense counsel had identified the "then existing state of mind" hearsay exception, the alleged statements were not relevant and, thus, were not admissible. Counsel is not

III

Bacani next contends that the trial court erred by redacting a portion of a recording of a 911 call that was played for the jury. Bacani asserts that the trial court's redaction violated the rule of completeness and misled the jury.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. State v. Brown, 132 Wn.2d 529, 571-72, 940 P.2d 546 (1997). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. Brown, 132 Wn.2d at 572.

The "rule of completeness," as codified in ER 106, provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the party at that time to introduce any other part . . . which ought in fairness to be considered contemporaneously with it." The offered statement must be relevant and must (1) explain the admitted evidence, (2) place the admitted portions in context, (3) avoid misleading the trier of fact, and (4) insure fair and impartial understanding of the evidence. State v. Larry, 108 Wn. App. 894, 910, 34 P.3d 241 (2001) (citing United States v. Velasco, 953 F.2d 1467, 1475 (7th Cir. 1992)).

Here, Bacani placed three 911 calls on the night of Harrison's murder. During the third 911 call, Bacani whispered to the emergency operator and displayed paranoid behavior. Bacani identified himself on the call and stated that

___

ineffective for failing to assert a hearsay exception when the evidence that is sought to be admitted is not relevant.

he was with a female friend, "Rachel." The emergency operator asked to speak to Rachel but Bacani refused, claiming that she was sleeping. Bacani told the emergency operator that there was "somebody outside with a gun" waiting for him. The emergency operator asked Bacani if he had any weapons on him and Bacani replied, "I kill to protect myself but I already got two strikes so I don't want to go there."[3] The chirping sound of the smoke alarm in the apartment could be heard in the background of the recording.

During pretrial motions, the parties agreed that there could be no discussion during trial of the penalty that Bacani faced if convicted, including any mention that a conviction would be Bacani's "third strike." One of Bacani's prior convictions was for robbery—a crime of dishonesty that would be admissible for impeachment purposes should Bacani elect to testify at trial. Defense counsel was cognizant of the prejudicial effect of introducing evidence of past crimes. Accordingly, defense counsel sought a ruling directing the State to refer to that conviction as a "theft of property" conviction or as a felony involving dishonesty should Bacani testify. The trial court denied the request. Bacani did not testify.

During trial, the State sought to play for the jury the portion of the recording of the third 911 call in which Bacani stated, "I kill to protect myself but I already got two strikes so I don't want to go there." Consistent with the pretrial discussion, the prosecutor redacted the words "but I already got two strikes." However, defense counsel objected to the redaction. Defense counsel argued that the redacted statement, "I kill to protect myself . . . so I don't want to go

---

[3] It is not clear whether the statement was "I kill," "I killed," or "I will kill."

there," was confusing and led to the inference that Bacani would kill Harrison. Defense counsel also argued that redaction of everything after "I kill to protect myself" was likewise misleading.[4]

The trial court disagreed. The trial court determined that the redaction of the "two strikes" comment was not confusing, that Bacani's utterance was highly probative, and that the admission of the redacted utterance was not unduly prejudicial. Defense counsel then requested that the *entire* utterance be played for the jury, including the "two strikes" comment. The State objected, referencing the pretrial ruling that evidence of prior "strikes" could not be admitted. The trial court agreed and the redacted call was later played for the jury.

On appeal, Bacani renews his contention that the redacted 911 call was misleading and led to the inference that Bacani would kill Harrison. Bacani also asserts that production of the entire utterance was required pursuant to the rule of completeness.

Bacani's assertions are unavailing. The redaction of the "two strikes" comment was entirely appropriate and not at all misleading. First, Bacani's statements were not directed at Harrison. Rather, the statements were made in response to the emergency operator's questions concerning the man outside with a gun and whether Bacani was armed. "I kill to protect myself . . . so I don't want to go there" is not a misleading statement, was not admitted to prove

---

[4] Defense counsel recognized that the admission of the "two strikes" comment was "problematic." The trial court observed that defense counsel's objection "sounds like an objection of reason. Why I am objecting is because it hurts my case."

conformity with a character trait, and was not a statement that was directed toward Harrison or "Rachel."

Second, defense counsel repeatedly recognized that evidence of prior crimes and references to the three strikes policy were highly prejudicial. It would have been damaging to Bacani's case for the jury to learn that he had previously committed two other serious crimes. Had the trial court granted defense counsel's request to have the "two strikes" comment played for the jury, Bacani would now likely be asserting a claim of ineffective assistance of counsel on appeal.[5]

Bacani's assertion that the rule of completeness required production of the entire utterance is likewise meritless. The rule of completeness contemplates the admission of other parts of a recorded statement when those parts "ought in fairness" be considered contemporaneously with the admitted statement. ER 106. The statement that is sought to be admitted must be relevant and the trial court must consider whether its admission will "insure a fair and impartial understanding of all of the evidence." Velasco, 953 F.2d at 1475. As discussed above, Bacani would have been prejudiced by the introduction of the "two strikes" comment. Its admission would not have facilitated a fair and impartial

---

[5] It is plain that the trial judge was aware of the unfairness to Bacani of the "two-strikes" evidence and of the potential for appellate second-guessing had the judge admitted the entire utterance. Bacani's appellate counsel, at oral argument, pressed the assertion that since trial counsel sought the evidence's admission, the trial judge should simply have acquiesced. Implied in this argument is the assurance that, after conviction, no appellate defense counsel would later seek to exploit the trial judge's acquiescence by claiming either trial court error or ineffective assistance of counsel in association with the admission of the greatly prejudicial "two-strikes" statement. "It is hard to say whether this conclusion springs from a touching faith in the good sportsmanship of criminal defense counsel or an unkind disparagement of their intelligence." Henderson v. United States, 568 U.S. 266, 286, 133 S. Ct. 1121, 185 L. Ed. 2d 85 (2013) (Scalia, J. dissenting). The trial judge's apprehension was well-warranted.

understanding of all of the evidence. Accordingly, the rule of completeness did not mandate its admission.

The trial court recognized that the admission of Bacani's "two strikes" comment would be highly prejudicial and determined that the redacted statement was relevant and not confusing or misleading. There was no abuse of discretion.[6]

### IV

Bacani next contends that the trial court erred by refusing to instruct the jury on voluntary intoxication. This is so, he asserts, because there was sufficient evidence to support the theory that Bacani was under the influence of methamphetamine at the time that Harrison was killed.

We review a trial court's refusal to give a proposed jury instruction for an abuse of discretion. In re Det. of Pouncy, 168 Wn.2d 382, 390, 229 P.3d 678 (2010). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. Brown, 132 Wn.2d at 572.

"Evidence of intoxication and its effect on the defendant may be used to prove that the defendant was unable to form the particular mental state that is an essential element of a crime." State v. Gallegos, 65 Wn. App. 230, 237, 828 P.2d 37 (1992) (citing RCW 9A.16.090; State v. Coates, 107 Wn.2d 882, 889, 735 P.2d 64 (1987)). "However, '[i]t is well settled that to secure an intoxication

---

[6] Bacani also asserts that he received ineffective assistance of counsel because his counsel failed to argue that the rule of completeness mandated the admission of the "two strikes" comment. Because the rule of completeness did not require the statement's admission, his claim fails.

instruction in a criminal case there must be substantial evidence of the effects of the alcohol on the defendant's mind or body.'" Gallegos, 65 Wn. App. at 237 (alteration in original) (quoting Safeco Ins. Co. v. McGrath, 63 Wn. App. 170, 179, 817 P.2d 861 (1991)).

"Under RCW 9A.16.090, it is not the fact of intoxication which is relevant, but the degree of intoxication and the effect it had on the defendant's ability to formulate the requisite mental state." Coates, 107 Wn.2d at 891. A defendant is entitled to a voluntary intoxication instruction only if "(1) the crime charged has as an element a particular mental state, (2) there is substantial evidence of drinking, and (3) the defendant presents evidence that the drinking affected his or her ability to acquire the required mental state."[7] Gallegos, 65 Wn. App. at 238 (footnote omitted).

Here, Bacani was charged with murder in the second degree under two alternative means. The State alleged that Bacani intended to (a) cause the death of another person, or (b) assault another person and, in the course of and in furtherance of that assault, caused the death of another person. RCW 9A.32.050(1)(a), (b). "A person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(a). Thus, Bacani was entitled to a voluntary intoxication instruction only if he produced substantial evidence that he was intoxicated at the

---

[7] The term "intoxication" "refers to an impaired mental and bodily condition which may be produced either by alcohol, which is a drug, or by any other drug." State v. Dana, 73 Wn.2d 533, 535, 439 P.2d 403 (1968).

time that he strangled Harrison *and* that his intoxication affected his ability to form the intent to assault Harrison or cause her death.

Bacani did not testify. Neither did he call an expert witness to testify concerning intoxication. Rather, Bacani relied exclusively on the testimony of three lay witnesses to establish that he was entitled to a voluntary intoxication instruction. Although it is true that a defendant is "not required to present expert testimony to establish that he or she was too intoxicated to form the necessary mental state," the evidence presented must "contain[] substantial evidence of the defendant's drinking *and of the effects of the alcohol on the defendant's mind or body*." State v. Gabryschak, 83 Wn. App. 249, 253, 921 P.2d 549 (1996) (emphasis added).

Bacani first relies on the testimony of Latena Isabel, his cousin. Isabel testified that, on the morning of February 3, 2015, she received a telephone call from Bacani. Isabel testified that Bacani asked her to call 911 because he had been hit by a car. Latena testified that she learned the following day that the 911 call was a ploy by Bacani to avoid undergoing a urinalysis for his community corrections officer.

Bacani next relies on the testimony of Andrew Whitehead, an acquaintance. Whitehead testified that he recalled an incident in which he observed Bacani acting strangely and believed that Bacani was under the influence of methamphetamine. Whitehead could not remember the exact day or time, though he believed that this incident occurred in February, around the time that Bacani had made several calls to Whitehead.

- 14 -

Finally, Bacani relies on the 911 calls that he made the night that Harrison was killed. Bacani asserted that his behavior on the 911 calls was erratic and indicative of intoxication.

The evidence upon which Bacani relies establishes, at most, that he was under the influence of drugs or alcohol at some point in time proximate to Harrison's death. But evidence of drinking or drug use alone "is insufficient to warrant the instruction; instead, there must be 'substantial evidence of the effects of the alcohol on the defendant's mind or body.'" Gabryschak, 83 Wn. App. at 253 (quoting Safeco Ins. Co., 63 Wn. App. at 179). Indeed, "[a] person can be intoxicated and still be able to form the requisite mental state." Gabryschak, 83 Wn. App. at 254.

None of the evidence presented at trial established that Bacani's intoxication affected his ability to form the requisite intent to assault or kill another person. Accordingly, the trial court refused to instruct the jury on voluntary intoxication. There was no error.

V

Bacani next contends that the prosecutor committed flagrant misconduct, thus depriving him of a fair trial. This is so, he asserts, because the prosecutor repeatedly used "we" statements during closing and rebuttal argument.

To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. State v. Miles, 139 Wn. App. 879, 885, 162 P.3d 1169 (2007). A defendant must object to a prosecutor's

improper argument at trial. "'[C]ounsel may not remain silent, speculating upon a favorable verdict, and then, when it is adverse, use the claimed misconduct as a life preserver on a motion for new trial or on appeal.'" State v. Reed, 168 Wn. App. 553, 577-78, 278 P.3d 203 (2012) (internal quotation marks omitted) (quoting State v. Russell, 125 Wn.2d 24, 93, 882 P.2d 747 (1994)). If a defendant does not object to the alleged misconduct at trial, the defendant is deemed to have waived any claim of error unless it is shown that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" State v. Emery, 174 Wn.2d 741, 761, 278 P.3d 653 (2012) (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

Here, during closing argument, the prosecutor argued to the jury that, although Bacani's reasons for strangling Harrison were unknown, the State did not have to prove motive before the jury could convict. The prosecutor asked a series of questions that remained unanswered concerning Bacani's motives and then stated that "[t]hese questions can really only be answered by the killer." Defense counsel interposed an objection, arguing that the prosecutor's statement was a comment on Bacani's decision to not testify. The objection was sustained and the jury was instructed to disregard the prosecutor's comment. Defense counsel objected again moments later when the prosecutor continued his argument by stating that "[w]e would love to be able to answer every question for Annelise Harrison's family, but we can't." The jury was again instructed to disregard the prosecutor's statement.

The prosecutor continued his argument.

> It is not a job that we have in this trial to answer every single question. The job here is to determine if the defendant has committed the crime he is charged with, which is murder in the second degree. That is why these elements are the only ones that need to be answered, the four listed up here.
>
> Does that make sense? Of course it does. That's right. The law is not a mystic thing. It is supposed to represent us as a society. It represents our shared beliefs, our shared understandings, our shared morals. The law is simply just a codification of that.
>
> That is what you have before you in the form of these jury instructions, the law. At first blush it is pretty wordy and it might seem a little complicated or confusing. But if you actually take the time to sit down and read it. And if you are confused, read it again, because you will see that it actually makes sense, it is because that the law is rooted in our common intellectual sense and our shared common moral sense.

Bacani again objected to the prosecutor's argument, stating simply, "Objection, Your Honor, 'our shared common moral sense?'" The objection was overruled.

The prosecutor continued his closing argument. Throughout his argument, the prosecutor made various "we" statements: "We have loads of independent evidence," "[w]e know that . . . it matches the paint that is in that apartment," "We still have more evidence of a violent struggle." The prosecutor ended his closing argument using the same language.

> As I said at the beginning of my remarks, we spent a lot of time together. I thank you for your attention during these closing remark[s]. We have met a lot of witnesses. We have heard a lot of testimony. We have seen a lot of evidence.
>
> Based on that evidence, we know what happened back on February 2nd, 2015. The evidence is clear. The evidence is overwhelming. That is that on that day, in the State of Washington, Justin Bacani, the defendant, committed intentional murder, which means that he acted with intent to cause the death of Annelise Harrison and Annelise Harrison died as a result of those acts; and/or, he committed felony murder, meaning that he . . . committed or attempted to commit assault in the second degree,

- 17 -

which again is strangulation assault, that he caused the death of Annelise Harrison in the course of that crime and Annelise Harrison was not a participant.

We know those things to be true. We know it beyond a reasonable doubt. We know what has to happen next. The defendant must be found guilty as charged of the crime of murder in the second degree.

It is the only conclusion that makes sense. It makes sense from the evidence. It makes sense with your intellect. It makes sense up here.

Defense counsel moved for a mistrial immediately following the prosecutor's argument. However, counsel did not do so to object to the prosecutor's use of "we" statements. Instead, defense counsel argued, "Well, Your Honor, there is addressing objections we do feel compelled – I understand that you struck what was said and you told the jury to disregard. We do think it is our responsibility to again request a mistrial as a result of those sorts of statements being made in closing arguments. . . . We think that being heard, period, so prejudices things that Mr. Bacani can't get a fair trial."

The trial court disagreed that a mistrial was the only available remedy.

I instructed the jurors to disregard those comments. I believe that is the appropriate remedy. If you would like for me to give an instruction when they come out that the attorney's arguments are not itself evidence, the evidence is the testimony, the exhibits that were admitted, I can. But otherwise, I think that that would be the only remedy that would be left. But I certainly don't feel that a mistrial is appropriate. You haven't shown any prejudice to your client to his ability to have a fair trial.

Defense counsel did not request a curative instruction.

On appeal, Bacani contends that the prosecutor's use of "we" statements constituted misconduct. Bacani asserts that the use of "we" statements were

manifestations of the prosecutor's personal opinion and were an attempt to align the jury with the State.

A

As a preliminary matter, the parties dispute whether Bacani has waived his claim of prosecutorial misconduct by failing to object to the prosecutor's use of "we" statements during closing argument.

Bacani contends that a motion for a mistrial based on prosecutorial misconduct necessarily preserves for appeal any specific claim of misconduct. Thus, he avers, because he moved for a mistrial based on the prosecutor's references to a "shared moral sense" and statement that "we would love to be able to answer every question," his claim of misconduct based on the prosecutor's "we" statements was not waived. In support of this assertion, Bacani relies on State v. Lindsay, 180 Wn.2d 423, 326 P.3d 125 (2014).

Bacani's reliance is misplaced. Lindsay concerned prosecutorial misconduct during closing argument and a subsequent motion for a mistrial based on that misconduct. 180 Wn.2d at 441. Although defense counsel in Lindsay did not interpose an objection to each and every instance of prosecutorial misconduct throughout the course of closing argument, defense counsel did identify a number of improper statements made by the prosecutor in the subsequent motion for a mistrial. The judge ruled that the prosecutor's comments were not improper and, accordingly, denied the motion. On appeal, defense counsel relied on the same statements identified in the motion for a

mistrial as the basis for the claim of misconduct. Lindsay, 180 Wn.2d at 431, 441.

The Supreme Court held that the motion for a mistrial in Lindsay served the same function as a contemporaneous objection. The trial court was given an opportunity to rule on each asserted basis for misconduct. This gave the trial court "a chance to correct the problem with a curative instruction." Lindsay, 180 Wn.2d at 441. Accordingly, the court ruled that the issue was adequately preserved for review.

Here, defense counsel never identified the prosecutor's use of "we" statements as a basis for misconduct, either in the form of a contemporaneous objection or as a basis for a mistrial. Defense counsel never objected to or identified in the motion for a mistrial any statement that constituted a personal opinion of the prosecutor or that was intended to align the jury with the State. Thus, the trial court was never given an opportunity to rule on whether these statements constituted misconduct, let alone issue a curative instruction.

Moreover, it also appears that defense counsel made a tactical decision to not object to the prosecutor's use of "we" statements. First, defense counsel waited until the end of the prosecutor's closing argument before moving for a mistrial, despite the prosecutor's frequent use of "we" statements throughout the lengthy argument. Had defense counsel objected to the use of "we" statements during closing argument, the issue could have been resolved immediately through a curative instruction. But defense counsel waited until after closing argument before moving for a mistrial and then tacitly declined the trial court's

offer of a curative instruction. This suggests that defense counsel was not interested in addressing any perceived misconduct at the outset but, rather, intended to let the wound fester until a mistrial was the only available remedy.

Second, after the trial court denied Bacani's motion for a mistrial, defense counsel elected to use the same tactics during his closing argument. Defense counsel repeatedly argued to the jury that "we don't know" various aspects of what occurred the night that Harrison was killed. Defense counsel also argued that "[w]e know" that Bacani did not hide from the police and that "[w]e can know that he tried to say where he was. We know that."

B

In any event, even if Bacani has not waived his claim, we conclude that the prosecutor's argument does not constitute misconduct.

It is improper for a prosecutor to personally vouch for the credibility of a witness. State v. Brett, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). "'Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony.'" State v. Robinson, 189 Wn. App. 877, 892-93, 359 P.3d 874 (2015) (internal quotation marks omitted) (quoting State v. Coleman, 155 Wn. App. 951, 957, 231 P.3d 212 (2010)). "Prejudicial error will not be found unless it is 'clear and unmistakable' that counsel is expressing a personal opinion." State v. Allen, 161 Wn. App. 727, 746, 255 P.3d 784 (2011) (internal quotation marks omitted) (quoting Brett, 126 Wn.2d at 175), affirmed, 176 Wn.2d 611, 294 P.3d 679 (2013).

Courts have routinely chastised prosecutors for the use of "we" statements. See United States v. Younger, 398 F.3d 1179, 1191 (9th Cir. 2005) (a prosecutor's use of "we know" "readily blurs the line between improper vouching and legitimate summary"); United States v. Bentley, 561 F.3d 803, 812 (8th Cir. 2009) (it is improper to use "we know" "when it suggests that the government has special knowledge of evidence not presented to the jury, carries an implied guarantee of truthfulness, or expresses a personal opinion about credibility"); State v. Mayhorn, 720 N.W.2d 776, 790 (Minn. 2006) ("[A] prosecutor is not a member of the jury, so to use 'we' and 'us' is inappropriate and may be an effort to appeal to the jury's passions."). However, a prosecutor's use of "we" in argument is unlikely to warrant reversal. See Robinson, 189 Wn. App. at 894-95 (a prosecutor's use of "we" to marshal evidence is not misconduct).

Here, the prosecutor's use of "we" did not constitute misconduct. Rather, the prosecutor's argument was an attempt—though perhaps unartful—to marshal evidence. "The evidence is clear. The evidence is overwhelming. . . . We know those things to be true." Here, as in Robinson, the prosecutor's use of "we" did not imply any special knowledge, express a personal opinion, or attempt to appeal to the jury's passions. 189 Wn. App. at 894-95.

There was no misconduct.

## VI

Finally, Bacani contends that cumulative errors mandate the reversal of his conviction. Bacani has not demonstrated any trial court error. There is

nothing to accumulate. Accordingly, his contention does not warrant appellate relief.

Affirmed.

We concur:

_Mann, A.C.J._

_Leach, J._